UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL CORPORATION, as attorney in fact for GE BUSINESS FINANCIAL SERVICES INC., | : : : : |
| Plaintiff, | : : |
| v. | : : : |
| WIJAYA BARU AVIATION SDN. BHD., WIJAYA BARU HOLDINGS SDN. BHD., KUALA DIMENSI SDN. BHD., DATO SERI TIONG KING SING, WIJAYA INTERNATIONAL MEDICAL CENTER SDN. BHD., WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, solely as OWNER TRUSTEE, and AIRFLYTE, INC. | : : : : : : : : : : |
| Defendants. | : : : |

# EXHIBIT D

MEI 15645574v.1

## CONSENT TO LEASE AND ASSIGNMENT

THIS CONSENT TO LEASE AND ASSIGNMENT (this "Consent") is being entered into as of April _12_, 2006, by and among MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., MERRILL LYNCH CAPITAL DIVISION, a Delaware corporation ("Lender"), WIJAYA BARU AVIATION SDN. BHD. (Company No.: 362080-U) ("Borrower"), and WIJAYA INTERNATIONAL MEDICAL CENTRE SDN. BHD. (Company No.: 621976-D) ("Lessee").

### RECITALS

A.    Lender and Borrower, along with WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a "Trust Agreement", known and denominated as the Wijaya Baru Aircraft Trust and dated as of April _12_, 2006, by and between Borrower and Wells Fargo Bank Northwest, National Association) ("Mortgagor"), entered into a Loan and Aircraft Security Agreement (S/N 298) dated as of April _12_, 2006 (as amended, restated and supplemented from time to time, the "Loan Agreement"), a copy of which is attached hereto as Exhibit A. Pursuant to the Loan Agreement, Borrower and Mortgagor have granted to Lender a first priority, perfected security interest and consented to a registered international interest in all of their rights, title and interests in, to and under one (1) Learjet Inc. model 60 aircraft, assigned S/N 298 and US registration number N729LJ, together with two (2) Pratt & Whitney Canada model PW305A engines, assigned S/N PCE-CA0455 and S/N PCE-CA0454 (as more particularly described in the Loan Agreement, the "Aircraft"). Capitalized terms not defined in this Consent are defined in the Loan Agreement.

B.    Borrower desires to lease the Aircraft to Lessee pursuant to a certain Aircraft Lease Agreement dated as of April _12_, 2006 (as amended, restated and supplemented from time to time, the "Lease"), a copy of which is attached hereto as Exhibit B.

C.    Because the Loan Agreement precludes any leasing of the Aircraft except upon the terms set forth therein, Borrower and Lessee have asked Lender to consent to the Lease, and Lender is willing to provide its consent, subject to the terms and conditions provided below.

NOW THEREFORE, in consideration of the above premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Lender, Borrower and Lessee agree as follows:

1.    Lender's Consent.  As long as no Event of Default has occurred under the Loan Agreement and all of Borrower's and Lessee's representations and warranties herein and in the Lease are true and correct, Lender hereby consents to Borrower entering into the Lease with Lessee with respect to the Aircraft subject to the other provisions of this Consent. The term Event of Default (as defined in the Loan Agreement) shall also include any default under this Consent or any default under the Lease.

2.    Supplemental Provisions.  Each of the following agreements by Borrower and Lessee are hereby incorporated into and made a part of the Lease (and each such agreement shall supercede any inconsistent provision now or hereafter contained in the Lease) and are made for the benefit of, and may be enforced by, Lender:

(a)    Lease.  No provision of the Lease shall be modified or waived if such modification or waiver either causes the Lease to be inconsistent with the Loan Agreement or this Consent, or impairs Lender's rights under the Loan Agreement or this Consent, or (as assigned hereby) under the Lease. Except upon the occurrence of an Event of Loss and the satisfaction of all obligations of Lessee then outstanding, the Lease shall not be terminated without giving Lender at least thirty (30) days' prior written notice of such termination.

(b)    Subject and Subordinate. The rights of Lessee (and any party claiming through Lessee) with respect to the Aircraft shall be expressly subject and subordinate in all respects to Lender's rights and interests in the Aircraft, including all of its rights and remedies under the Loan Agreement and the other Loan Documents.

(c)    Primary Hangar; Inspection. The Aircraft shall be principally based at Old Cargo Complex SAAS International Airport, 47200 Subang, Selangor Darul Ehsan, Malaysia. Lessee agrees that Lender or its designated employee(s) or agent(s) may inspect the Aircraft, any component thereof and all logs, manuals, certificates and records with respect thereto pursuant to the Loan Agreement. Further, Lessee agrees not to change the Primary Hangar location without Lender's prior written consent, which shall not be unreasonably withheld.

(d)    No Inconsistent Actions. Neither Borrower nor Lessee will take any action under, or enter into any agreement relating to, the Lease that conflicts with the Loan Agreement or this Consent. To the extent of a conflict or inconsistency between this Consent and the terms and conditions of the Lease, this Consent will prevail. Without limiting the foregoing, the Aircraft shall not be managed, used, chartered, operated, piloted, equipped, maintained, repaired, modified, inspected, serviced, located, leased, subleased, assigned, interchanged, conveyed, encumbered, transferred or otherwise disposed of, in a manner that is inconsistent with the Loan Agreement or this Consent.

(e)    Return of Aircraft. Upon demand by Lender in connection with an Event of Default under the Loan Agreement, the Lease shall terminate and possession and control of the Aircraft will be relinquished to Lender or Lender's designee, unless Lender notifies Lessee, in writing, of Lender's election to permit Lessee to continue to lease the Aircraft pursuant to the Lease. Borrower and Lessee hereby agree to execute any termination of the Lease or any related agreements reasonably required by Lender in connection with the terms of the preceding sentence.

(f)    Usage. The Aircraft shall be based in Malaysia and the Aircraft shall not be flown, operated, used or located in, to or over any such country or area (temporarily or otherwise), (i) that is excluded from the insurance required under the Loan Agreement or hereunder (or not specifically covered by such insurance), (ii) in any area of recognized or threatened hostilities, or (iii) in violation of this Consent or any Applicable Standards, including any U.S. law or United Nations Security Council Directive.

(g)    Lessee's Representations and Indemnifications. Lender may rely upon the truth and accuracy of all representations and warranties made to Borrower by Lessee in the Lease to the same extent and effect as if such representations and warranties had been made directly to and for the benefit of Lender. Lender shall be an express third party beneficiary of any indemnities and disclaimers of condition made by Lessee in favor of Borrower contained in the Lease.

(h)    Interest in Aircraft. Lessee hereby acknowledges and agrees that: (i) it does not have, and it hereby disclaims, any present or future right, title or interest (other than Lessee's leasehold interest, as and to the extent provided in the Lease, and as limited hereby), including, without limitation, any international interest or prospective international interest under the Cape Town Convention (as hereinafter defined), in or to the Aircraft, or any engine, auxiliary power unit, or any part thereof, and it will keep all of the same free and clear of liens or international interests attributable to Lessee, and (ii) any upgrades, modifications, additions, parts, engines, auxiliary power units, avionics, and other equipment, property or software, attached or added to, incorporated into, or otherwise made a part of the Aircraft by Lessee or any service provider or vendor pursuant to the Lease, shall immediately, without further act, become part of the Aircraft and subject to the security interest and international interest created by the Loan Agreement, free and clear of liens or international interests for which Lessee is responsible.

3.    Borrower Remains Liable. Borrower agrees that it is and shall remain primarily and fully responsible for all of its obligations under the Loan Agreement notwithstanding any provision of the Lease, including, any agreement by Lessee to perform its obligations thereunder. Without limiting the foregoing, Borrower shall remain responsible for (a) obtaining and maintaining (or causing Lessee to

obtain and maintain) all of the insurance coverages required under the Loan Agreement, in strict accordance with the provisions thereof, and (b) providing, or causing Lessee to provide, evidence satisfactory to Lender of such insurance as and when such evidence is required under the Loan Agreement.

    4.   Assignment.

    (a)  Collateral Assignment.  In consideration of Lender participating in the transactions contemplated in the Loan Agreement (including this Consent) and in order to secure Borrower's full and timely payment and performance of all of its obligations under the Loan Agreement and other Loan Documents, Borrower hereby assigns and grants to Lender a first priority security interest in, international interest in and lien on the following collateral (the "Collateral"): all of Borrower's right, title and interest in, to and under (i) the Lease (as extended and renewed), including the right to receive any and all payments and other amounts relating thereto, (ii) any and all Associated Rights, accounts, payment intangibles and other general intangibles, deposit accounts, chattel paper, and other property or rights relating thereto, including with respect to any insurance policies obtained pursuant to the Lease, (iii) all books and records relating to any of the foregoing, (iv) any further leasing or other disposition of the Aircraft or any rights of usage thereto, including, without limitation, any chartering of the Aircraft, which grant shall not constitute permission by Lender to any of the foregoing in contravention of the explicit terms and conditions of the Loan Agreement, and (v) all proceeds of any and all of the foregoing.

    (b)    Payments to Lender.  Lessee hereby acknowledges the assignment and grant in Section 4(a) above, and agrees that from and after the occurrence of an Event of Default under the Loan Agreement and notification thereof from Lender, all amounts payable to Borrower under the Lease (the "Lease Proceeds"), shall be paid to Lender without regard to any abatement, deduction, set-off, defense, counterclaim, recoupment, claim, right of rescission or termination, deferment or diminution for any reason. Each of Lessee and Borrower shall hold in trust and promptly remit to Lender any Lease Proceeds accrued or payable after Lender delivers written notice to Lessee of such Event of Default.

    (c)    Without the prior written consent of Lender, neither Borrower nor Lessee shall assign or transfer the Lease, any of its rights or obligations under the Lease, its leasehold or any other interest therein, or otherwise permit the Aircraft to be operated by, or to come into or remain in the possession of, anyone but Lessee.

    5.   Lender's Rights Upon Default.  Any breach of any representation, warranty or agreement in this Consent, or in any agreement entered into in connection with this Consent, by Borrower or Lessee shall constitute an immediate Event of Default under the Loan Agreement. Without limiting any term of this Consent or the Loan Agreement, upon the occurrence of any Event of Default under the Loan Agreement (whether or not arising hereunder), Lender shall have the right at its sole election to exercise any and all of the following remedies (a) Lender may exercise all of its rights, powers and remedies under the Loan Agreement, including, without limitation, its right to immediate possession of the Aircraft and to the return of the Aircraft to any location in the Continental United States as may be specified by Lender, notwithstanding any rights or interests Lessee or any other such party may have; (b) pursuant to Section 4(b) hereof, Lender may notify Lessee to pay the Lease Proceeds directly to Lender, and in such event Borrower agrees not to collect any such payments thereafter; (c) Lender may enforce, modify, cancel or terminate the Lease; (d) Lender may exercise remedies against or with respect to the Aircraft; and (e) Lender may exercise any other remedy available to it pursuant to Applicable Law, including, without limitation, all rights and remedies under the Cape Town Convention, and Borrower and Lessee hereby consent to the same. All rights granted hereunder shall be cumulative and not alternative, shall be in addition to and shall in no manner impair or affect Lender's rights under the Loan Agreement, or any other agreement, statute or rule of law. Each of Borrower and Lessee agrees to cooperate with Lender's exercise of any such rights, powers and remedies. Without limiting the generality of the foregoing, upon Lender's demand, Borrower and Lessee, at their sole cost and expense, each agrees to deliver possession of the Aircraft to Lender to any location in the Continental United States as may be specified by Lender. Borrower shall be liable for any costs, charges or expenses incurred by Lender in enforcing or protecting its rights under this Consent.

6.  Indemnity.  Without limiting or otherwise prejudicing any Indemnitee's rights under any other provision of this Consent or the Loan Agreement: (a) Borrower hereby confirms that any and all Claims imposed on, incurred by or asserted against an Indemnitee in any way relating to or arising out of this Consent, the Lease or any documents contemplated thereby, or the performance or enforcement of any of the terms hereof or thereof, shall constitute Claims covered by the indemnification provisions set forth in Section 8.2(b) of the Loan Agreement. (b) Lessee assumes liability for, and hereby agrees to indemnify, protect, save, defend and keep harmless each Indemnitee, on a net after-tax basis, from and against any and all Claims that may be imposed on, incurred by or asserted against such Indemnitee whether or not such Indemnitee shall have the right to be indemnified as to any such Claim by any other Person, in any way relating to or arising out of any action or failure to act by Lessee regarding this Consent, the Lease or any agreements related thereto, or the performance or enforcement of any of the terms hereof or thereof; provided, however, that Lessee shall not be required to indemnify an Indemnitee for any Claim caused by the gross negligence (except as imputed by law) or willful misconduct of such Indemnitee. (c) If any Claim is made against Lessee, Borrower or an Indemnitee, the party receiving notice of such Claim shall promptly notify the others, but the failure of the party receiving notice to so notify the other shall not relieve Lessee or Borrower of any obligation hereunder.

7.  **DISCLAIMER.  LENDER SHALL NOT BE DEEMED TO HAVE MADE, AND HEREBY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE AIRCRAFT, INCLUDING ANY ENGINE, PART OR RECORD, OR ANY MATTER WHATSOEVER, INCLUDING, THE AIRCRAFT'S DESIGN, CONDITION, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE, ABSENCE OF ANY PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT OR LATENT DEFECT (WHETHER OR NOT DISCOVERABLE BY BORROWER, LESSEE OR ANY OTHER PERSON), COMPLIANCE OF THE AIRCRAFT WITH ANY APPLICABLE LAW, CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE DOCUMENT OR TO THE DESCRIPTION SET FORTH IN THE LOAN AGREEMENT, OR ANY INTERFERENCE OR INFRINGEMENT, OR ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE, NOR SHALL LENDER BE LIABLE, FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR FOR STRICT OR ABSOLUTE LIABILITY IN TORT; AND EACH OF BORROWER AND LESSEE HEREBY WAIVES ANY CLAIMS ARISING OUT OF ANY OF THE FOREGOING.**

8.  Further Assurances; Notices; Power of Attorney.

(a)     Further Assurances.  Each of Borrower and Lessee agrees that it will promptly execute and deliver or cause to be executed and delivered any and all further instruments and documents as Lender may reasonably request from time to time consistent with the purposes of this Consent.  Borrower hereby authorizes Lender to complete and file any financing statements Lender deems desirable in order to perfect its security interest in the Aircraft and/or file this Consent, with an executed counterpart of the Lease, with the FAA.  Only Counterpart No. 1 of the Lease shall be considered the "chattel paper" copy thereof.  Immediately after executing one or more copies of the Lease, only one manually executed original shall be marked "Counterpart No. 1", and shall be hand delivered to Lender.  Without limiting the generality of the foregoing, the parties hereto undertake to enter into, execute and deliver such documents as may be necessary or desirable to register an international interest under the Cape Town Convention, if Lender determines that registration of an international interest (as defined in the Cape Town Convention) is necessary or advisable to protect Lender's interests under this Consent, the Lease or the Loan Agreement.  In furtherance thereof, Borrower and Lessee hereby consent to the creation of a registered international interest and shall, upon request by Lender (i) take all action necessary to authorize, make and/or consent to filings with the International Registry; and (ii) appoint an administrator and a professional user entity that has the authority to make and/or consent to filings with the International Registry, all in accordance with the International Registry Procedures and the International Registry Regulations established by the International Registry from time to time.

(b)      Notices. All communications and notices provided for herein shall be in writing and shall become effective (i) upon hand delivery, (ii) upon delivery by an overnight delivery service addressed to Lender, Borrower or Lessee, as the case may be, at their respective addresses set forth under the signatures hereto or such other address as any party may hereafter designate by written notice to the others, or (iii) when sent by telecopy (with customary confirmation of receipt of such telecopy) on the business day when sent or upon the next business day if sent on other than a business day.

(c)      Power of Attorney. Borrower acknowledges that Lender may exercise its power of attorney granted under the Loan Agreement as and when Lender deems necessary or appropriate to carry out the intent of this Consent. Without limiting the foregoing, upon and after any Event of Default, Lender may endorse Borrower's name on any checks, notes, drafts or any other payments or instruments relating to the Lease and/or the Aircraft. With regard to any insurance provided by Lessee for the Aircraft, Lessee hereby irrevocably appoints Lender its attorney-in-fact to act in Lessee's name and on its behalf to make, execute, deliver and file any instruments or documents, settle, receive payment, make claim or proof of loss, endorse Lessee's name on any checks, drafts or other instruments in payment of such claims and to take any action as Lender deems necessary or appropriate to carry out the intent of the Loan Agreement. This appointment is coupled with an interest, is irrevocable and shall terminate only upon payment in full of the obligations set forth in the Loan Agreement and/or any other Loan Documents.

9.    No Assumption. Nothing in this Consent shall constitute (a) an assumption by Lender of any responsibility for the performance by Borrower and/or Mortgagor under, or any liability arising in connection with, the Lease, or (b) a waiver or limitation of any of Lender's rights or remedies, or Borrower's and/or Mortgagor's obligations, under the Loan Agreement.

10.   Miscellaneous.

(a)      Governing Law; Binding Effect. This Consent shall be governed by, and construed in accordance with, the laws of the State of Illinois, without regard to its conflict of laws rules and shall be binding upon each of Lender, Borrower and Lessee and their respective successors and assigns and shall inure to the benefit of Lender and its successors and assigns. In the event of any conflict between any Cape Town Convention provisions in this Consent and any provisions in this Consent not related to the Cape Town Convention, the provisions relating to the Cape Town Convention shall prevail. Each of Borrower and Lessee hereby irrevocably consents and agrees that any legal action, suit or proceeding arising out of or in any way in connection with this Consent may be instituted or brought in the courts of the State of Illinois or any Federal court sitting in Cook County, Illinois, or other court as Lender may elect. EACH OF BORROWER AND LESSEE ALSO HEREBY KNOWINGLY AND FREELY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY LITIGATION ARISING HEREFROM OR IN RELATION HERETO. All of Lender's rights and privileges contained herein, and all indemnities, shall survive the expiration or other termination of the Lease or this Consent.

(b)      Representations. Each of Borrower and Lessee hereby represents, warrants and agrees that: (i) Each of this Consent, the Lease and any related document entered into by Borrower or Lessee, as the case may be, has been duly authorized, executed and delivered by such party and constitutes the legal, valid, binding agreement of such party, enforceable against them in accordance with its terms. (ii) Lessee has the form of business organization indicated and is and will remain duly organized and existing in good standing under the laws of the jurisdiction specified below its signature and is duly qualified to do business wherever necessary to perform its obligations under this Consent. (iii) Lessee's exact legal name is as shown in the caption of this Consent; the address of Lessee's mail, chief executive offices and principal place of business are all as respectively set forth below its signature under "Notice Information". (iv) Lessee agrees that it shall not change its name or any such address without prior written notice to Lender. (v) The Aircraft shall not be used for any pilot training activities (other than for Lessee's crew members) and shall at all times comply with all Applicable Laws with respect to its performance and compliance with the Lease. (vi) Either Borrower or Lessee shall at all times maintain "operational control" (as defined in the FAA Regulations) of the Aircraft, unless otherwise permitted by the Loan Documents. (vii) The Aircraft shall be based in Malaysia and the Aircraft shall not be flown, operated, used or located in, to or over any such country or area (temporarily or otherwise), (a) that is excluded from the insurance

required under the Loan Agreement or hereunder (or not specifically covered by such insurance), (b) with which the U.S. does not maintain favorable diplomatic relations, (c) in any area of recognized or threatened hostilities, or (d) in violation of this Consent or any Applicable Standards, including any U.S. law or United Nations Security Council Directive.

(c)     Entire Agreement; Modifications; Etc.  This Consent and the Loan Agreement contain the entire agreement among the parties hereto regarding the subject matter hereof and completely and fully supercede all other prior agreements, both written and oral, among the parties relating to the subject matter of this Consent.   Any agreements, acknowledgments, indemnifications, representations and warranties in this Consent by Borrower in favor of Lender shall be deemed to supplement and be a part of the Loan Agreement, but the Loan Agreement shall otherwise remain unmodified and in full force and effect.  This Consent shall not be modified, altered, amended or waived in whole or in part except in writing duly signed by each party. Any waiver shall be effective only in the specific instance and for the specific purpose for which it is given.  No failure to exercise, or delay in exercising, any right hereunder shall operate as a waiver of such right; nor shall any failure to exercise, or partial exercise of, any right under this Consent preclude any other or further exercise of such right or the exercise of any other right. If any provision in this Consent or any part of such provision is held invalid or unenforceable, such invalidity or unenforceability shall not affect or impair the validity or the enforceability of the remaining provisions, or any part thereof, of this Consent, which shall remain in full force and effect.  This Consent may be executed in any number of counterparts, all of which when taken together shall constitute but a single instrument. The headings in this Consent are for convenience only and shall not limit or otherwise affect any of the terms hereof.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Consent to be executed by their respective duly authorized representatives and seal (as applicable) as of the date first above written.

**MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.,** MERRILL LYNCH CAPITAL DIVISION
Lender

By: _____
Name: PAMELA A LENAMON
Title:   V.P.

Notice Address:
Merrill Lynch Capital – Equipment Finance Group
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601 USA
Attn: Managing Director
Telephone: 312-750-6274
Facsimile:   312-750-6108

The Common Seal of          )
**WIJAYA BARU AVIATION SDN. BHD.**  )
(Company No. 362080-U)       )
Was hereunto affixed in accordance with  )
Its Articles of Association    )
in the presence of:          )

_____
Director

_____
Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn: Stephen Abook
Telephone: 011-603-77813779
Facsimile:   011-603-77853117
Borrower

The Common Seal of          )
**WIJAYA BARU MEDICAL SERVICES SDN. BHD.**  )
(Company No. 621976-D)       )
Was hereunto affixed in accordance with  )
Its Articles of Association    )
in the presence of:          )

_____
Director

_____
Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn: Stephen Abook
Telephone: 011-603-77813779
Facsimile:   011-603-77853117
Lessee

IN WITNESS WHEREOF, the parties hereto have caused this Consent to be executed by their respective duly authorized representatives and seal (as applicable) as of the date first above written.

**MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.,** MERRILL LYNCH CAPITAL DIVISION
Lender

By:_____
Name:
Title:

Notice Address:
Merrill Lynch Capital – Equipment Finance Group
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601 USA
Attn: Managing Director
Telephone: 312-750-6274
Facsimile:  312-750-6108

The Common Seal of
**WIJAYA BARU AVIATION SDN. BHD.**
(Company No. 362080-U)
Was hereunto affixed in accordance with
Its Articles of Association
in the presence of:

Director

Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn: Stephen Abok
Telephone: 011-603-77813779
Facsimile:  011-603-77853117
Borrower

The Common Seal of
**WIJAYA INTERNATIONAL MEDICAL CENTRE SDN. BHD.**
(Company No. 621976-D)
Was hereunto affixed in accordance with
Its Articles of Association
in the presence of:

Director

Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn: Stephen Abok
Telephone: 011-603-77813779
Facsimile:  011-603-77853117
Lessee

300632_3

(CONSENT TO LEASE)

### ATTESTATION/AUTHENTICATION

I, **FARHAH HAYATI MAMAT**, an Advocate and Solicitor of the High Court of Malaya practising at **Kuala Lumpur**, hereby certify that on this ____ day of **– 6 APR 2006**, 2006, the common seal of **WIJAYA BARU AVIATION SDN. BHD. (362080-U)** was duly affixed to the above written instrument in my presence in accordance with its Articles of Association.

Dated this ____ day of **– 6 APR 2006**, 2006.

Witness my hand

Advocate & Solicitor
**FARHAH HAYATI MAMAT**
**ADVOCATES & SOLICITOR**
**KUALA LUMPUR**

### ATTESTATION/AUTHENTICATION

I, **FARHAH HAYATI MAMAT**, an Advocate and Solicitor of the High Court of Malaya practising at **Kuala Lumpur**, hereby certify that on this ____ day of **– 6 APR 2006**, 2006, the common seal of **WIJAYA INTERNATIONAL MEDICAL CENTRE SDN. BHD. (621976-D)** was duly affixed to the above written instrument in my presence in accordance with its Articles of Association.

Dated this ____ day of **– 6 APR 2006**, 2006.

Witness my hand

Advocate & Solicitor
**FARHAH HAYATI MAMAT**
**ADVOCATES & SOLICITOR**
**KUALA LUMPUR**

300632_3                                                    (CONSENT TO LEASE)

EXHIBIT A

**LOAN AGREEMENT**

(CONSENT TO LEASE)

## LOAN AND AIRCRAFT SECURITY AGREEMENT (S/N 298)

THIS LOAN AND AIRCRAFT SECURITY AGREEMENT (S/N 298) (together with all Addenda, Annexes, Exhibits and Riders hereto, this "Agreement") is dated as of April 12 , 2006 (the "Closing Date"), by and among **WIJAYA BARU AVIATION SDN. BHD.**, a private company limited by shares organized under the laws of Malaysia, with company number 362080-U ("Borrower"); **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a "Trust Agreement", known and denominated as the Wijaya Baru Aircraft Trust and dated as of April 12 , 2006, by and between Borrower and Wells Fargo Bank Northwest, National Association) ("Mortgagor"); and **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., MERRILL LYNCH CAPITAL DIVISION**, a corporation organized under the law of the State of Delaware of the United States of America ("Lender").

In consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

Capitalized terms used but not otherwise defined herein or in any addenda hereto shall have the meanings ascribed to them in Annex A attached hereto and made a part hereof.

Section 1.  Terms of Loan.

1.1  Loan.  Subject to the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower in the principal amount set forth in Annex B attached hereto and made a part hereof (the "Loan").  The Borrower's obligation to repay the Loan shall be evidenced by a Promissory Note dated the Closing Date, payable by Borrower to the order of Lender in the original principal amount of the Loan (as amended, modified, restated, extended and renewed from time to time, the "Note").  The Loan shall bear interest and be repaid by Borrower at the times and in the manner set forth in the Note.

1.2  Prepayment.  The Loan may be prepaid only in the manner and subject to terms and conditions set forth in the Note and, if applicable, Section 4.7 hereof.

1.3  Use of Proceeds.  Borrower shall use the proceeds of the Loan to finance or refinance the costs of the acquisition of the Aircraft.

1.4  Commitment Fee.   In consideration of the agreement by Lender to extend the Loan to Borrower in accordance with and subject to the terms hereof, Borrower has paid or shall, on or before the Closing Date, pay the Commitment Fee to Lender.  Borrower acknowledges and agrees that the Commitment Fee has been fully earned by Lender, and that it will not under any circumstances be refundable.

Section 2.  Conditions of Borrowing and Delivery of Post Closing Items.

(a)   Lender's obligation to make the Loan shall be both subject to and conditioned upon the satisfaction of all of the conditions precedent specified in the Closing Terms Addendum attached hereto and made a part hereof.

(b)   Within one hundred eighty (180) days after the Closing Date, Borrower and/or Mortgagor shall deliver to Lender evidence that the Aircraft has been added to the FAR Part 135 Certificate of Aviation Concepts, Inc., a corporation organized under the laws of Guam.

Section 3.  Representations and Warranties.  In order to induce Lender to enter into this Agreement and to make the Loan herein provided for, Borrower and Mortgagor, as applicable, represent and warrant to Lender that:

300518                                                              (LOAN AGREEMENT)

(a)    (i) Borrower has the form of business organization set forth in <u>Annex D</u> hereto and is and will remain duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization set forth in <u>Annex D</u> hereto and Mortgagor is a national banking association organized and existing under the laws of the United States of America, as Owner Trustee under the Trust Agreement, which is administered and governed under the laws of the State of Utah of the United States of America, (ii) Borrower is duly qualified to do business in each jurisdiction in which the conduct of its business or the ownership or operation of its assets requires such qualification, including the jurisdiction of the primary hangar location of the Aircraft; (iii) Borrower and Mortgagor each has the necessary authority and power to operate the Aircraft and its other assets and to transact the business in which it is engaged; (iv) Borrower has contributed the Aircraft to an owner trust established under the Trust Agreement and such trust is a "citizen of the United States" within the meaning of the Federal Aviation Act and Mortgagor hereby confirms the same; (v) Borrower and Mortgagor as of the Closing Date, are situated in a Contracting State(s), as defined in the Cape Town Convention; and (vi) Borrower and Mortgagor each has full power, authority and legal right to execute and deliver this Agreement, the Trust Agreement, the Note and the other Loan Documents (as the respective case may be), to perform its obligations hereunder and thereunder, to borrow hereunder, to contribute the Aircraft to the trust created by the Trust Agreement (and accept the Aircraft in trust) to grant the assignment and security interest created by this Agreement, and to dispose of the Aircraft by way of mortgage in accordance with the terms of this Agreement as contemplated by the Cape Town Convention (as each of the foregoing applies to Borrower and Mortgagor);

(b)    Borrower's name as shown in the preamble of this Agreement is Borrower's exact legal name as shown on its charter, certificate of incorporation, certificate of formation, memorandum and articles of association, by-laws, articles of organization or operating agreement (or their equivalent), as applicable, each as amended as of the Closing Date and Mortgagor's name as shown in the preamble of this Agreement is Mortgagor's exact legal name as denominated in the Trust Agreement;

(c)    Borrower's organizational identification number (if any) and the chief executive office and principal place of business address of Borrower are all as set forth on <u>Annex D</u> hereto and Mortgagor's chief executive office and principal place of Business is that of the Owner Trustee (as defined in the Trust Agreement) and as set forth on <u>Annex D</u>;

(d)    no consent of any other party (including any stockholders, members trustees or holders of indebtedness), and no consent, license, approval or authorization of, exemption by, or registration or declaration with, or notice to, any governmental body, authority, bureau or agency is required in connection with the execution, delivery or performance by Borrower and Mortgagor (as the respective case may be) of this Agreement, the Trust Agreement, the Note and the other Loan Documents, or the validity or enforceability of this Agreement, the Trust Agreement, the Note and the other Loan Documents, except recordation of this Agreement with the FAA (and the approval of the Trust Agreement by the FAA), registration of the international interest arising under this Agreement with the International Registry, filing of UCC financing statements in the appropriate recording offices, registration of the Loan with the Central Bank of Malaysia and the filing of relevant forms at the appropriate registry(ies) in Malaysia which shall have been duly effected as of the Closing Date;

(e)    the execution, delivery and performance by Borrower and Mortgagor (as the respective case may be) of this Agreement, the Trust Agreement, the Note and the other Loan Documents do not and shall not violate any provision of any Applicable Law, will not violate any provision of Borrower's or Mortgagor's organizational documents and will not violate any provision of or cause a default under any mortgage, indenture, contract, agreement or other undertaking to which Borrower and/or Mortgagor (as the respective case may be) is a party or which purports to be binding upon Borrower and/or Mortgagor (as the respective case may be) or upon any of its/their assets, and will not result in the creation or imposition of any Lien on any of the assets of Borrower and/or Mortgagor other than the security interest intended to be created hereby and the registered international interest in the Aircraft in favor of Lender;

(f)     this Agreement, the Trust Agreement, the Note and the other Loan Documents each has been duly authorized, executed and delivered by Borrower and Mortgagor (as the respective case may be) and constitutes the legal, valid and binding obligation of Borrower and Mortgagor (as the respective case may be) enforceable in accordance with its terms (including, without limitation, the grant of security interest in this Agreement and the creation of an international interest in the Aircraft), except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, and the equitable discretion of any court of competent jurisdiction;

(g)     Borrower and Mortgagor have (i) taken all action necessary to authorize making and/or consenting to filings with the International Registry; (ii) appointed an administrator and a professional user entity that has the authority to make and/or consent to filings with the International Registry, all in accordance with the International Registry Procedures and the International Registry Regulations; and (iii) received all necessary approvals from the International Registry;

(h)     there is no action, suit, investigation or proceeding before any court, administrative officer or administrative agency that is pending or, to the best of Borrower's and/or Mortgagor's knowledge, threatened against or affecting Borrower and/or Mortgagor or any of its/their assets nor is there any dispute between Borrower and/or Mortgagor and any governmental regulatory body or other Person involving the Aircraft or any of the transactions contemplated by this Agreement and the other Loan Documents or which, if adversely determined, could have (i) an adverse effect upon the transactions contemplated by this Agreement and the other Loan Documents, the ability of Borrower and/or Mortgagor to perform its/their obligations under the Loan Documents (as the respective case may be) or Lender's interest in the Aircraft, or (ii) a material adverse effect on the business, operations or financial condition of Borrower and/or Mortgagor (collectively, a "Proceeding").  Borrower and Mortgagor have no pending claims and have no knowledge of any facts upon which a future claim may be based, against any prior owner, the manufacturer or supplier of the Aircraft, or of any Engine or part thereof for breach of warranty or otherwise;

(i)     (i) Borrower has contributed title to the Aircraft to Mortgagor and Mortgagor has good and marketable title to the Aircraft subject to no Liens except the security interest created hereby in favor of Lender and the registered international interest in the Aircraft in favor of Lender; (ii) Lender has a legal, valid and continuing first priority security interest in the Collateral, free and clear of all other Liens (other than Permitted Liens); and (iii) all filings, recordings or other actions necessary or desirable in order to establish, perfect and give first priority to such security interest (including, the filing of this Agreement with the FAA and the registration of the international interest arising under this Agreement with the International Registry) have been duly effected, and all Impositions in connection therewith have been duly paid;

(j)     each of Borrower and Mortgagor is not in default, and no event or condition exists which after the giving of notice or lapse of time or both would constitute an event of default, under any mortgage, indenture, contract, agreement, judgment or other undertaking to which Borrower and/or Mortgagor is/are a party or which purports to be binding upon Borrower and/or Mortgagor or upon any of its/their assets;

(k)     all financial statements of Borrower and Guarantors, copies of which have been heretofore delivered to Lender, are complete and correct, have been prepared in accordance with GAAP, and present fairly the financial position of Borrower and Guarantors as at the date thereof and the results of its operations for the period ended on said date and there has been no material adverse change in the financial condition, business or operations of Borrower and Guarantors since the date thereof;

(l)     Borrower has filed all federal, state and local income tax returns that are required to be filed and has paid all taxes as shown on said returns and all assessments received by it to the extent that such taxes and assessments have become due, and Borrower does not have any knowledge of any actual or proposed deficiency or additional assessment in connection therewith;

(m)  the Aircraft is certificated for at least eight (8) seats (including crew) and each of the Engines is capable of generating 1,750 or more pounds of thrust or the equivalent of such thrust;

(n)  (i) the Aircraft has been delivered to Borrower, is in Borrower's possession and is, as of the Closing Date, unconditionally, irrevocably and fully accepted by Borrower, (ii) the Aircraft has been inspected by Borrower to its complete satisfaction and, without limiting the foregoing, the Aircraft (A) has been found to be airworthy and otherwise in good working order, repair and condition and fully equipped to operate as required under Applicable Standards for its purpose, and (B) is in conformity with the requirements of the related purchase agreements and the Applicable Standards; and (iii) all of the avionics set forth on Schedule A to Annex C hereto are on board the Aircraft and are in proper working condition, and (iii) the Aircraft is primarily hangared at the location set forth on Annex D hereto;

(o)  Borrower and Mortgagor will not directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of Lender, Merrill Lynch & Co., Inc., or any of their Affiliates;

(p)  each of Borrower and Mortgagor warrants that it has not engaged, retained, hired, entered into a contract with, or otherwise made an arrangement with, any broker, intermediary, or other arranger with respect to the acquisition of the Aircraft or the transactions contemplated by this Loan or any Loan Document;

(q)  the Guaranty does not contravene or constitute a default under any Applicable Law, or any contract, mortgage, agreement indenture, or other instrument to which any of the Guarantors is a party or which any of the Guarantors may be bound;

(r)  the Guaranty has been duly executed and delivered by each of the Guarantors and constitutes a legal, valid and binding obligation of each of the Guarantors enforceable in accordance with its terms except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, and the equitable discretion of any court of competent jurisdiction;

(s)  there are no proceedings pending or, threatened against or affecting any of the Guarantors or any of his/its/their property before any court, administrative officer or administrative agency that, if decided adversely, could affect the net worth or asset of any of the Guarantors or the ability of any of the Guarantors to perform his/its/their obligations under the Guaranty;

(t)  the Loan and the other transactions contemplated in this Agreement are not "consumer transactions" for purposes of any Applicable Law, and the Aircraft and any Collateral was not or will not be purchased or held primarily for personal, family or household purposes; and

(u)  BORROWER AND MORTGAGOR HEREBY REPRESENT WARRANT, COVENANT AND AGREE THAT IT/THEY ARE FULLY SATISFIED WITH THE SUITABILITY OF THE AIRCRAFT FOR ITS INTENDED PURPOSE, THAT THE AIRCRAFT (AND TYPE) WAS CHOSEN BY BORROWER AND MORTGAGOR FOR ITS/THEIR USE AND INTENDED PURPOSE, AND BORROWER AND MORTGAGOR HEREBY ACKNOWLEDGE AND AGREE THAT LENDER DOES NOT MAKE AND HAS NOT MADE ANY WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE AIRCRAFT OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE AND THAT BORROWER AND MORTGAGOR HEREBY WAIVE ANY RIGHTS THEY MAY HAVE AGAINST LENDER WITH RESPECT TO THE SAME.

Section 4.  Covenants.  Borrower and Mortgagor (as the respective case may be) covenant and agree that from and after the Closing Date and so long as any of the Obligations are outstanding:

4.1  Notices; Financial Information; and Further Assurances.  Borrower and Mortgagor will, at their sole expense:

(a)  promptly give written notice to Lender of (i) the occurrence of any Default or Event of Default; (ii) the occurrence of any Event of Loss; (iii) the commencement or threat of any Proceeding; (iv)

any change in Borrower's and/or Mortgagor's presently existing jurisdictional organizational identification number or of the issuance of a jurisdictional organizational identification number if Borrower or Mortgagor currently has no such jurisdictional organizational number but is subsequently issued such a number; (v) any Material Damage concurrently with its report of same to the applicable governmental authority, and if no such report is required, within ten (10) days of the occurrence of such Material Damage, together with any damage reports provided to the FAA or any other governmental authority, the insurers or supplier of the Aircraft, and any documents pertaining to the repair of such damage, including copies of work orders, and all invoices for related charges; (vi) any Lien (other than Permitted Liens) that attaches to the Aircraft and the full particulars of the Lien, within ten (10) days after Borrower and/or Mortgagor becomes aware of such Lien; (vii) any change of the primary hangar location from that set forth in Annex D hereto, at least ten (10) days prior to any such change; (viii) any accident involving the Aircraft causing bodily injury or property damage to third parties, within five (5) days of such accident; (ix) the renewal or replacement of the insurance coverage required by this Agreement, at least ten (10) days prior to the policy expiration date for such insurance; (x) any material change in the appearance or coloring of the Aircraft; and (xi) any change in Borrower's and/or Mortgagor's presently existing legal name, jurisdiction of organization, formation or incorporation, mailing, chief executive office and/or principal place of business address, at least thirty (30) days' prior to any such change.

(b)  furnish to Lender (i) as soon as available, but in any event not later than one hundred eighty (180) days after the end of each respective fiscal year of Borrower and each corporate Guarantor, Borrower's and each corporate Guarantor's balance sheet as of the end of such respective fiscal year, statements of income, retained earnings and changes in financial position of Borrower and each corporate Guarantor for such respective fiscal year, all in reasonable detail, prepared in accordance with GAAP and certified by independent certified public accountants of recognized standing selected by Borrower and corporate Guarantors (which shall be a firm acceptable to Lender)(such financial statements may be consolidated for Borrower and corporate Guarantors, if that is the case); provided, however, the financial information set forth in this subsection (i) shall be provided to Lender in unaudited form with respect to Borrower and each corporate Guarantor within one hundred twenty (120) days after the end of each respective fiscal year of Borrower and each corporate Guarantor, (ii) all of Borrower's and each corporate Guarantor's required securities exchange reports, if any, filed with the applicable securities exchange within thirty (30) days after the date on which they are filed (by furnishing these securities exchange forms, or making them publicly available in electronic form, Borrower and each corporate Guarantor shall be deemed to have satisfied the requirements of clause (b)(i), if the required financial information is contained in such securities exchange forms, (iii) promptly, such additional financial and other information as Lender may from time to time reasonably request, and (iv) with respect to Individual Guarantor, on or before February 28 and August 31 of each year, financial statements of Individual Guarantor as of the immediately preceding December 31 and June 30, respectively, prepared in reasonable detail and certified as true and correct by such Guarantor; and

(c)  promptly execute and deliver, and/or cause Guarantors to execute and deliver, to Lender such further instruments, UCC, FAA, International Registry, and other lien notice and/or perfection filings and other documents, and take such further action, as Lender may from time to time reasonably request in order to further carry out the intent and purpose of this Agreement and to establish and protect the rights, interests and remedies created, or intended to be created, in favor of Lender hereby, including, without limitation, consenting, through its professional user entity, to international registration upon issuance of the request for consent by the International Registry.  Borrower and Mortgagor hereby irrevocably authorize Lender and any employee, officer or agent thereof, in such jurisdictions where such action is authorized by law, to effect any such recordation or filing without the signature of Borrower or Mortgagor thereto.

4.2  General Obligations.  Borrower and Mortgagor shall: (a) duly observe and conform to all requirements of this Agreement and the Loan Documents; (b) duly observe and conform to all requirements of Applicable Law relating to the conduct of its/their business, the Aircraft and to its/their properties or assets; (c) obtain and keep in full force and effect all rights, franchises, licenses and permits that are necessary to the proper conduct of its/their business; (d) Mortgagor shall remain a "citizen of the United States" within the meaning of the Federal Aviation Act; (e) obtain or cause to be obtained as

promptly as possible any governmental, administrative or agency approval and make any filing or registration therewith required with respect to the performance of its/their obligations under this Agreement and the other Loan Documents and the operation of the Aircraft and its/their business; (f) cause the Aircraft to remain duly registered, in Mortgagor's name, under the Federal Aviation Act; (g) maintain all Records to be maintained with respect to the Aircraft; (h) pay and perform all of its/their obligations and liabilities when due; and (i) keep proper books of records and accounts in which full, true and correct entries in accordance with GAAP will be made of all dealings or transactions in relation to its/their business and activities.

4.3   <u>Taxes and Duties</u>.   Borrower and Mortgagor will file, with all appropriate taxing authorities, all Federal, foreign, state and local income tax returns that are required to be filed and all registrations, declarations, returns and other documentation with respect to any personal property taxes, asset taxes, value added taxes (or any other taxes in the nature of or imposed in lieu of property taxes, asset taxes or value added taxes) and stamp duty (if any) or other similar duties to which the Loan Documents or any related documents may be subjected to due or to become due with respect to the Aircraft. Borrower and/or Mortgagor will (i) pay on or before the date when due all taxes as shown on said returns and all taxes assessed, billed or otherwise payable with respect to the Aircraft directly to the appropriate taxing authorities; and (ii) pay when due all license and/or registration fees, assessments, governmental charges and sales, withholding, use, property, asset, excise (including, any applicable FET taxes or segment fees), privilege, value added, stamp duty and any and all other taxes (including any related interest or penalties) or other charges or fees now or hereafter imposed by any governmental body or agency upon Borrower, Mortgagor, the Aircraft or any other property of Borrower and/or Mortgagor with respect to the landing, airport use, manufacturing, ordering, shipment, purchase, financing, ownership, delivery, installation, leasing, chartering, operation, possession, use or other disposition of the Aircraft (the items referred to in (i) and (ii) above being referred to herein collectively, as "<u>Impositions</u>"). Borrower and Mortgagor shall provide to Lender annually (or at such other times as Lender may require) evidence that all Impositions due to all applicable tax authorities have been fully paid (i.e., in the form of a tax receipt or other similar evidence of payment). All such payments (including, without limitation, loan payments) or indemnifications to be made under this Agreement or the other Loan Documents will be made free and clear of any deduction or withholding for any present or future Impositions payable under Applicable Law, and Borrower and Mortgagor agree to indemnify Lender against any and all such Impositions and shall gross-up and include any amount necessary to hold Lender harmless on a net after-tax basis from all Impositions required to be paid, withheld or deducted with respect to any such payment to be made to Lender hereunder or under the Loan Documents, such that the net payment received by Lender after such Imposition payment, withholding or deduction on the grossed-up amount equals the amount called for under this Agreement or the other Loan Documents, as the case may be.

4.4   <u>No Unpermitted Disposition of Collateral or Liens; Title and Security Interest</u>.

(a)   Except as expressly permitted below, Borrower and Mortgagor shall not sell, assign, charter, lease, timeshare, pool, convey, mortgage, consent to the registration of an international interest or national interest, execute and deliver an irrevocable de-registration and export request authorization, exchange or otherwise transfer or relinquish possession of or dispose of the Aircraft, any part thereof or any of the Collateral or attempt or offer to do any of the foregoing. In addition, Borrower and Mortgagor shall not relinquish possession of the Airframe, any APU, Engine or Part or install any APU, Engine or Part, or permit any APU, any Engine or Part to be installed, on any airframe other than the Airframe except as expressly permitted herein. The foregoing shall not be deemed to prohibit the delivery of possession of the Aircraft, any APU, Engine or Part to another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, for alteration or modification. Borrower and Mortgagor will not create, assume or suffer to exist any Liens on or with respect to the Aircraft, any APU, Engine, Part or any of the other Collateral, or Borrower's or Mortgagor's interest therein other than Permitted Liens. Borrower and Mortgagor will promptly take such action as directed by Lender to duly discharge any such Lien. If Borrower and/or Mortgagor fail to remove a Lien (other than a Permitted Lien), Lender may take such action as it deems appropriate to remove such Lien, but without waiving its other rights hereunder. Without limiting the generality of the foregoing, Borrower and/or Mortgagor shall not (i) consent to any Person other than Lender making any registrations in the International Registry in relation to the Airframe and Engines, or (ii)

execute and deliver any irrevocable de-registration and export request authorization to any Person other than the IDERA in favor of Lender. Mortgagor will warrant and defend its good and marketable title to the Aircraft and Lender's first and only perfected security interest in the Collateral, against all claims and demands whatsoever.

(b)   Notwithstanding the foregoing, provided that no Event of Default has occurred and is continuing, Borrower and/or Mortgagor (as the applicable case may be) may enter into a lease of the Aircraft, subject to the satisfaction of the following conditions: (i) the lessee thereunder is and remains a solvent organization and is reasonably acceptable to Lender; (ii) the lease thereunder (A) is a true lease under Applicable Law, (B) expressly, at all times remains, is and remains subject and subordinate to this Agreement and the rights of Lender hereunder and in and to the Aircraft (and shall terminate, or be canceled, at the option of Lender, upon the occurrence of an Event of Default), (C) does not permit any further disposition (except as expressly permitted pursuant to, and in strict accordance with, paragraph (b) of this Section 4.4), (D) does not contain provisions that are inconsistent with the provisions of this Agreement or cause Borrower and/or Mortgagor to breach any of its/their representations, warranties or agreements under this Agreement, and (E) otherwise conforms to any consent required by Lender pursuant hereto; (iii) Borrower or Mortgagor delivers to Lender a fully executed copy of such lease, which is, and will be, the only copy of such lease constituting chattel paper under Applicable Law; and (iv) each of Borrower, Mortgagor and such lessee complies with all Applicable Laws relating thereto, including, the Truth-In-Leasing provisions of the FARs. In addition to the conditions set forth above, Borrower's and/or Mortgagor's right to enter into any or all of such arrangements are further conditioned upon, and Borrower and Mortgagor shall comply with all of the following: (i) if Lender so requests, Borrower and/or Mortgagor shall deliver to Lender a consent, prepared by Lender and in a form required by Lender, duly executed and delivered by Borrower, Mortgagor (if applicable) and the applicable lessee (upon execution and delivery thereof, the terms and conditions of such consent shall be hereby incorporated herein by their reference without further action), together with any other consents and/or acknowledgments duly executed and in form and substance satisfactory to Lender, along with such other instruments (including, without limitation, FAA recording documents, UCC financing statements, and consents to filings with the International Registry established under the Cape Town Convention) as Lender may reasonably require and shall take such other actions as are deemed reasonably necessary or desirable by Lender to effect the terms and conditions of this Section and maintain the perfection and priority of Lender's Lien on and registered international interest in the Aircraft and the other Collateral, (ii) if Lender so requests, Borrower, Mortgagor (if applicable) and the lessee shall take all actions as Lender may deem to be necessary or desirable to evidence the foregoing subordination, including, without limitation, consenting to the registration of the subordination on the International Registry established under the Cape Town Convention, and (iii) Borrower and/or Mortgagor shall reimburse Lender for any and all costs incurred by it in connection therewith. None of the arrangements permitted above will reduce any of the obligations of Borrower or Mortgagor hereunder or the rights of Lender hereunder, or of any party under any consent required pursuant hereto, and all of such obligations shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety.

(c)   Notwithstanding the foregoing, provided that no Event of Default has occurred and is continuing, Borrower and/or Mortgagor (as the applicable case may be) may enter into the Management Agreement(s) with Manager(s), pursuant to which each of the Managers may provide management and/or charter services (as applicable) with respect to the Aircraft from time to time pursuant to the following terms and conditions: (A) each of the Managers (1) is and remains a solvent, organization with an internationally recognized favorable reputation and is reasonably acceptable to Lender; and (2) with respect to any charter operations while any such Manager is in operational control of the Aircraft, such Manager, has, and at all times maintains, a current and valid Air Carrier Certificate issued by the FAA, and any such Manager operating the Aircraft for charter operations shall at all times be in full compliance with Federal Aviation Regulations Part 135 or any other applicable statutes, laws, rules and regulations with respect to any Management Agreement, any charter and/or use and operation of the Aircraft under any such Management Agreement or charter (including, any necessary OpSpec for such operations); and (B) each of the applicable Management Agreements (1) grant no property interest to any of the Managers with respect to the Aircraft at any time that it/they is/are in possession of the Aircraft pursuant to any such Management Agreement, and expressly, and at all times each such Manager's and any charterer's rights

with respect to the Aircraft shall remain, subject and subordinate to this Agreement and the rights of Lender hereunder and in and to the Aircraft (and shall terminate, or be canceled, at the option of Lender, upon the occurrence of an Event of Default), (2) does not permit any further disposition (other than chartering permitted hereunder), (3) does not contain provisions that are inconsistent with the provisions of this Agreement or cause Borrower and/or Mortgagor or any of the Managers to breach any of its/their representations, warranties or agreements under this Agreement or any of the other Loan Documents, and (4) otherwise conforms to any consent required by Lender pursuant hereto. In addition to the conditions set forth above, Borrower's and/or Mortgagor's right to enter into any or all of such arrangements are further conditioned upon, and Borrower and Mortgagor shall comply with all of the following: (i) if Lender so requests, Borrower and/or Mortgagor (as applicable) shall deliver to Lender the Consent(s) to Management Agreement(s), prepared by Lender and in a form required by Lender, duly executed and delivered by Borrower, Mortgagor, any lessee and each of the Managers (as applicable) (upon execution and delivery thereof, the terms and conditions of such consent shall be hereby incorporated herein by their reference without further action), together with any other consents and/or acknowledgments duly executed and in form and substance satisfactory to Lender, along with such other instruments (including, without limitation, FAA recording documents, UCC financing statements, and consents to filings with the International Registry established under the Cape Town Convention) as Lender may reasonably require and shall take such other actions as are deemed reasonably necessary or desirable by Lender to effect the terms and conditions of this Section and maintain the perfection and priority of Lender's Lien on and registered international interest in the Aircraft and the other Collateral, (ii) if Lender so requests, Borrower, Mortgagor (if applicable) and each of the Managers shall take all such other actions as Lender may deem to be necessary or desirable to evidence the foregoing subordination, including, without limitation, consenting to the registration of the subordination on the International Registry established under the Cape Town Convention, and (iii) Borrower and/or Mortgagor shall reimburse Lender for any and all costs incurred by it in connection therewith. None of the arrangements permitted above will reduce any of the obligations of Borrower or Mortgagor hereunder or the rights of Lender hereunder, or of any party under any consent required pursuant hereto, and all of such obligations shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety.

4.5   Use of Aircraft; Maintenance; Excess Use; Modifications; Loaner Engines; Identification; Security.

(a)   Borrower and/or Mortgagor (as the case may be) will operate the Aircraft under and in compliance with Part 91 of the FARs, for purposes that are incidental to Borrower's business, and in a manner that is consistent with the transactions hereunder being deemed commercial (and not consumer) transactions under Applicable Law. Unless otherwise expressly permitted hereunder, Borrower and Mortgagor shall not operate or permit the Aircraft to be operated for air taxi operations or otherwise under Part 135 of the FARs (if operation under Part 135 of the FARs is permitted hereunder, Borrower and Mortgagor shall operate (or cause the operation of) the Aircraft under Part 135 of the FARs when required by Applicable Law). The Aircraft shall be used solely in a passenger configuration or for air ambulance service for which Borrower is duly authorized by the FAA. Borrower and Mortgagor will not operate or permit the Aircraft to be operated in any manner, at any time or in any geographic area when or where the insurance required hereunder shall not be in effect or Borrower and/or Mortgagor shall be in breach thereof. Unless otherwise expressly permitted by Section 4.4 hereof, Borrower and/or Mortgagor (as the case may be) shall retain operational control of the Aircraft at all times and base the Aircraft at the primary hangar location set forth in Annex D hereto. The Aircraft at all times will be operated by duly qualified pilots having satisfied all requirements established and specified by the FAA, the Transportation Security Administration, any other applicable governmental authority and the insurance policies required under this Agreement. Without limiting the foregoing, the Aircraft will be used for business or commercial purposes, and not primarily for personal, family or household purposes. Borrower and Mortgagor shall obtain and maintain during the term of this Agreement all permits, approvals, consents, authorizations, concessions and other permissions required under Applicable Law for the proper operation, hangaring and maintenance of the Aircraft, including, without limitation, any permits, approvals, consents, authorizations, concessions or other permissions required under Malaysian law or regulation or by any governmental agency or department of Malaysia (including the DCA). Upon the written request of Lender, Borrower

and Mortgagor hereby agree to provide copies (or other written evidence of the same, acceptable to Lender) to Lender of all of the permits, approvals, consents, authorizations, concessions or other permissions required pursuant to the preceding sentence and in the event that any of the same are required to be renewed from time to time, Borrower and Mortgagor shall provide evidence that the same have been renewed prior to the end of the then current term of such permits, approvals, consents, authorizations, concessions or other permissions.

(b)    Borrower and Mortgagor will operate (or cause the same) the Aircraft in compliance with all Applicable Standards, including, without limitation, its operation, maintenance and security.  The Aircraft shall not be flown, operated, used or located in, to or over any such country or area (temporarily or otherwise), (i) that is excluded from the insurance required hereunder (or not specifically covered by such insurance), (ii) in any area of recognized or threatened hostilities, or (iii) in violation of this Agreement or any Applicable Standards, including any United States of America law or United Nations Security Council Directive.

(c)    Borrower and/or Mortgagor will, at its/their own expense, (i) maintain, inspect, service, repair, overhaul and test the Airframe, each Engine, any APU and each Part in accordance with Applicable Standards; (ii) make any alteration or modification to the Aircraft that may at any time be required to comply with Applicable Standards, to cause the Aircraft to remain airworthy or to maintain the Aircraft's airworthiness certification; (iii) furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the condition and operating efficiency of the applicable Airframe, Engine, APU or Part will at all times be no less than its condition and operating efficiency as and when delivered to Borrower, ordinary wear and tear from proper use alone excepted; (iv) promptly replace all Parts that become worn out, lost, stolen, taken, destroyed, damaged beyond repair or permanently rendered or declared unfit for use for any reason whatsoever; (v) maintain (in English) all Records in accordance with Applicable Standards; and (vi) enroll and maintain the Airframe in a Computerized Maintenance Monitoring Program and the Engines in the Engine Maintenance Program (and, as Lender may require in its sole discretion, deliver to Lender any assignment and/or notice agreement with respect to such Computerized Maintenance Monitoring Program or Engine Maintenance Program, whereby such program provider shall notify Lender of a default under such program and Lender shall have the right (but not the obligation) to continue such program with the applicable program provider after a default of Borrower or Mortgagor (as the case may be) thereunder).  All repairs, parts, replacements, mechanisms and devices so furnished shall immediately, without further act, become part of the Aircraft and subject to the security interest created by this Agreement.  All maintenance procedures shall be performed by properly trained, licensed, and certified maintenance sources and maintenance personnel utilizing replacement parts approved by the FAA and the manufacturer of the applicable Airframe, Engine, APU or Part.  Without limiting the foregoing, Borrower shall comply with all mandatory service bulletins and airworthiness directives by causing compliance to such bulletins and/or directives to be completed through corrective modification in lieu of operating manual restrictions.  Borrower and Mortgagor shall not discriminate in its/their maintenance between the Aircraft and any such other aircraft that may be leased, owned or operated by Borrower and/or Mortgagor so as to impair the standards which would otherwise be applicable to the Aircraft.

(d)    On or before the tenth (10th) day after each annual anniversary of the Closing Date, Borrower shall provide to Lender a report specifying the number of flight hours on the Airframe at the start of said year of operation and the number of flight hours on the Airframe at the end of said year of operation, in each case as determined by the Aircraft's Hobbs meter.  If the number of flight hours on the Airframe in any year of operation (based on a 12-month period commencing on the Closing Date and each 12-month period thereafter) is in excess of the flight hours limitation set forth on Annex B hereto, then Borrower shall pay Lender an amount equal to the per hour charge set forth on Annex B hereto for each flight hour during such 12-month period in excess of such flight hours limitation.  Lender shall apply such payment as a partial prepayment of the Note without any prepayment penalty.  Such payment shall be made to Lender on or before the sixtieth (60th) day after each annual anniversary of the Closing Date.

(e)    Borrower and Mortgagor will not make or authorize any improvement, change, addition or alteration to the Aircraft that will impair the originally intended function or use of the Aircraft, diminish the

value of the Aircraft as it existed immediately prior thereto, or violate any Applicable Standard; and any Part, mechanism, device or replacement added to the Aircraft in connection therewith shall immediately, without further act, become part of the Aircraft and subject to the security interest created by this Agreement and the registered international interest in the Aircraft in favor of Lender. The parties hereby acknowledge and agree that Borrower and/or Mortgagor shall have the right to install any necessary air ambulance equipment in the Aircraft; provided that such installation and/or modifications (and the operation of such equipment) meet all Applicable Standards at all times during the term of this Agreement.

(f)   Borrower and Mortgagor shall prominently display on the Aircraft the FAA Registration number specified in Annex C attached hereto. If requested by Lender in writing, Borrower and Mortgagor shall, at its/their expense, attach to the Aircraft a notice satisfactory to Lender disclosing Lender's security interest in the Aircraft.

(g)   In the event any Engine is damaged, being inspected, repaired or overhauled, Borrower and/or Mortgagor (as the case may be), at its/their option, may temporarily substitute another engine of the same make and model as the Engine being repaired or overhauled (any such substitute engine being hereinafter referred to as a "Loaner Engine") during the period of such repair or overhaul; provided no Event of Default or Default has occurred and is continuing (i) installation of the Loaner Engine is performed by a maintenance facility certified by the FAA and the manufacturer with respect to an aircraft of this type, (ii) the Loaner Engine is removed and the repaired or overhauled original Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul but in no event later than the earlier of ninety (90) days after removal or the occurrence of an Event of Default, and (iii) the Loaner Engine is free and clear of any Lien that might impair Lender's rights or interests in the Aircraft and is maintained in accordance herewith.

(h)   Borrower and Mortgagor shall implement all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts. Upon Lender's request (but without Lender having any obligation with respect to Borrower's or Mortgagor's compliance with the provisions of this Section 4.5(h)), Borrower and Mortgagor shall provide Lender with evidence of Borrower's and Mortgagor's compliance with its/their obligations under this Section 4.5(h).

4.6   Insurance.

(a)   Borrower and Mortgagor agree to maintain at all times, at its/their sole cost and expense, with insurers of recognized reputation and responsibility satisfactory to Lender (but in no event having an A.M. Best or comparable agency rating of less than "A-"):

(i)   insurance of the type and amounts set forth in Annex B hereto;

(ii)   (A) "all-risk" ground, taxiing, and flight hull insurance on an agreed-value basis, covering the Aircraft, provided that such insurance shall at all times be in an amount not less than the greater of (1) the full replacement value of the Aircraft (as determined by Lender), or (2) the unpaid principal amount of the Note (each such amount re-determined as of each anniversary of the Closing Date for the next succeeding year throughout the term of this Agreement); and

(iii)   war risk and allied perils (including confiscation, repossession, appropriation, expropriation, terrorism and hijacking insurance) in the amounts required in paragraphs (i) and (ii), as applicable.

(b)   Any policies of insurance carried in accordance with this Section 4.6 and any policies taken out in substitution or replacement of any such policies shall (i) be endorsed to name Lender as an additional insured as its interests may appear (but without responsibility for premiums), (ii) provide, with respect to insurance carried in accordance with Section 4.6(a)(ii) or (a)(iii) above, that any amount payable thereunder shall be paid directly to Lender as loss payee as its interest may appear and not to Lender and Borrower (or Mortgagor) jointly, (iii) provide for thirty (30) days' (seven (7) days' in the case of

war, hijacking and allied perils insurance) prior written notice by such insurer of cancellation, material change, or non-renewal, (iv) include a severability of interest clause providing that such policy shall operate in the same manner as if there were a separate policy covering each insured, (v) waive any right of set-off against Borrower, Mortgagor or Lender, and any rights of subrogation against Lender, (vi) provide that in respect of the interests of Lender in such policies, that the insurance shall not be invalidated by any action or inaction of Borrower, Mortgagor or any other Person operating or in possession of the Aircraft, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by or binding upon Borrower, Mortgagor or any other Person operating or in possession of the Aircraft, and (vii) be primary, not subject to any co-insurance clause and shall be without right of contribution from any other insurance.   Notwithstanding clause (ii) of the preceding sentence, so long as no Default has occurred and is continuing, and no Default, Event of Default or Event of Loss with respect to the Aircraft has occurred, any amount payable to Lender pursuant to clause (ii) above shall be paid if (A) $250,000.00, or more, in the aggregate, to Lender and Borrower (or Mortgagor, a the case may be), jointly, as their interests may appear, and released by Lender to Borrower (or Mortgagor, as Borrower shall direct) or other appropriate Persons in payment of the costs actually incurred with respect to repairs made to the Aircraft so as to restore it to the operating condition required by this Agreement, or shall be disbursed by Lender as otherwise required by this Agreement, or (B) less than $250,000.00 in the aggregate, to Borrower (or Mortgagor, as Borrower shall direct) (and such amounts shall be applied by Borrower and Mortgagor to pay the costs of such repairs).

(c)   All of the coverages required herein shall be in full force and effect worldwide throughout any geographical areas to, in or over which the Aircraft is operated.  Borrower and Mortgagor shall not self-insure (by deductible, premium adjustment, or risk retention arrangement of any kind) the insurance required to be maintained hereunder.  All insurance proceeds payable under the requisite policies shall be payable in U.S. Dollars.  Borrower and Mortgagor agree that it/they shall obtain and maintain such other insurance coverages, or cause adjustments to be made to the scope, amount or other aspects of the existing insurance coverages, promptly upon Lender's request, as and when Lender deems such additional insurance coverages or modifications to be appropriate in light of any changes in Applicable Standards, the insurance market, Borrower's or Mortgagor's anticipated use of the Aircraft or other pertinent circumstances.

(d)   Annually on or before the anniversary of the Closing Date, Borrower and Mortgagor shall furnish to Lender an insurance certificate in form and substance satisfactory to Lender evidencing that Borrower and Mortgagor have obtained the insurance coverages required herein for a twelve (12) month or greater period commencing from and after such anniversary date, and, if Lender shall so request, a copy of the applicable policies.  In the event Borrower or Mortgagor shall fail to maintain insurance as herein provided, Lender may, at its option, provide such insurance, and Borrower and Mortgagor shall, upon demand, reimburse Lender for the cost thereof, together with interest at the  Default  Rate from the date of payment through the date of reimbursement.  On or prior to the Closing Date and at the time required above for any renewal of insurance coverages, if Lender so requests, Borrower and Mortgagor shall provide written confirmation from the insurance underwriter or broker that the insurance coverages provided by Borrower and Mortgagor is in compliance with the requirements of this Section 4.6.

(e)   To the extent that the Aircraft is in the possession of, operated by, leased by or managed by any Person(s) other than Borrower or Mortgagor, Borrower and Mortgagor shall carry (or cause to be carried), at the cost of Borrower and Mortgagor, the same types of insurances described above with respect to such Person(s), in accordance with the terms and conditions set forth above, and any other terms and conditions that Lender may reasonably require.

4.7   <u>Event of Loss</u>.

(a)   Upon the occurrence of any Event of Loss with respect to the Airframe and/or the Aircraft, Borrower and Mortgagor shall notify Lender of any such Event of Loss within five (5) days of the date thereof.  Borrower and/or Mortgagor shall pay on the earlier of (i) the date on which the insurer(s) disburse the insurance proceeds relating to such Event of Loss, and (ii) ninety (90) days after the occurrence of such Event of Loss, the following amounts: (a) the unpaid principal amount of the Note, (b) interest accrued

thereon to the date of prepayment, and (c) the prepayment fee set forth in the Note and any and all other amounts then due hereunder or under the other Loan Documents. Upon indefeasible payment in full of such amounts and so long as no Event of Default has occurred and is continuing, the Aircraft shall be released from the security interest of this Agreement and Lender shall discharge all registrations with the International Registry with respect to the Aircraft.

(b)    Upon an Event of Loss with respect to any Engine or APU under circumstances in which there has not occurred an Event of Loss with respect to the Airframe, Borrower and/or Mortgagor shall, within ninety (90) days after the occurrence of such Event of Loss, replace such Engine or APU, as applicable, and grant to Lender a first priority security interest in and consent to the registration of an international interest with the International Registry with respect to a similar or better engine or auxiliary power unit, as applicable. Such engine or auxiliary power unit, as applicable, shall be of the same make and model number as the Engine or APU suffering the Event of Loss and shall be free and clear of all Liens and shall have a value, utility and useful life at least equal to, and be in as good an operating condition as, the Engine or APU suffering the Event of Loss, assuming such Engine or APU was in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss. Borrower and/or Mortgagor, at its/their own cost and expense, shall furnish Lender with such documents to evidence such conveyance and make such filings as Lender shall request to subject such engine or auxiliary power unit, as applicable, to the lien of this Agreement and shall consent to the registration of an international interest in such engine. Each such replacement engine or auxiliary power unit, as applicable, shall, after such conveyance be deemed an "Engine" or "APU" (as defined herein), as applicable, and shall be deemed part of the same Aircraft as was the Engine or APU replaced thereby.

(c)    Lender shall be entitled to receive and retain all proceeds payable by any insurer with respect to an Event of Loss, by any manufacturer with respect to a Return to Manufacturer or by any governmental authority with respect to any Requisition of Use, as the case may be; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing and Borrower and Mortgagor have complied with the provisions of this Section 4.7, then Lender shall remit such proceeds to Borrower (or Mortgagor, as directed by Borrower).

(d)    If the Airframe, any Engine, APU or major Part has suffered any damage requiring the FAA to be notified of such damage by use of an FAA Form 337 or otherwise, then within ten (10) days of such notification to the FAA, Borrower and Mortgagor shall notify Lender of such damage, and Lender and Borrower (and/or Mortgagor) shall consult for the purpose of determining the diminished value of the Aircraft resulting from such damage history. The diminished value of the Aircraft shall be the amount by which the fair market sales value of the Aircraft without such damage history exceeds the fair market sales value of the Aircraft with such damage history. For purposes hereof, fair market sales value shall be determined on the following basis: (i) the value shall be the amount which would be obtained in an arm's length transaction between an informed and willing buyer (who is not a used aircraft dealer), and an informed and willing seller under no compulsion to sell; (ii) the costs of removal of the Aircraft from its then location shall not be a deduction from such value; and (iii) in determining any such value, it shall be assumed (whether or not the same be true) that the Aircraft has been maintained by Borrower and Mortgagor and is in the condition in which it is required to be in accordance with this Agreement and that the total number of Airframe flight hours (including any component with hourly overhaul schedules) accumulated from the Closing Date to the date of such damage do not exceed the product of the flight hours limitation set forth in Annex B hereto times the number of twelve month periods and any portion thereof from the Closing Date to such date.

Within thirty (30) days after Borrower and/or Mortgagor and Lender agree upon the diminished value of the Aircraft, Borrower and/or Mortgagor shall pay Lender the amount of such diminished value, which payment Lender shall apply as a partial prepayment of the Note without any prepayment penalty. If Borrower (or Mortgagor) and Lender cannot agree on the diminished value of the Aircraft within ten (10) days after notification of such damage to the FAA, then within five (5) days, Lender and Borrower (or Mortgagor) shall mutually agree to and appoint an aircraft appraiser to determine such diminished value. If the parties are unable to mutually agree to and appoint an aircraft appraiser, then each of Lender and Borrower (or Mortgagor) shall within five (5) days appoint one (1) independent appraiser, and if the two

(2) aircraft appraisers are unable to agree upon the diminished value within five (5) days of the last appraiser being appointed, the two (2) independent appraisers shall within five (5) days appoint a third aircraft appraiser. Within five (5) days after the third aircraft appraiser is appointed, the aircraft appraisers shall determine the diminished value of the Aircraft, and if all three of the aircraft appraisers are unable to agree upon such diminished value, the agreement of two of such aircraft appraisers shall determine such diminished value for purposes of this Agreement (if two (2) aircraft appraisers are unable to agree on such value, the average of the two (2) closest appraisals shall be deemed to be the diminished value of the Aircraft for purposes of this Agreement). All aircraft appraiser(s) shall be independent aircraft appraiser(s) and the costs and expenses for all aircraft appraisers appointed (and the determination of the diminished value of the Aircraft) shall be payable by Borrower and/or Mortgagor. Within five (5) days after the independent appraiser's(s') determination of the diminished value of the Aircraft, Borrower and/or Mortgagor shall pay Lender the amount of such diminished value, which payment Lender shall apply as a partial prepayment of the Note without any prepayment penalty.

Section 5. <u>Security Interest/International Interest; Power of Attorney; Inspection</u>.

    5.1   <u>Grant of Security Interest/International Interest</u>.

        (a)  As collateral security for the prompt and complete payment and performance as and when due of all of the Obligations and in order to induce Lender to enter into this Agreement and make the Loan to Borrower in accordance with the terms hereof, Mortgagor hereby grants to Lender a first priority security interest in and lien on, and consents to the registration of an international interest in, and collaterally assigns to Lender, all of Mortgagor's right, title and interest in, to and under all of the following collateral (collectively, the "<u>Collateral</u>"): (i) the Aircraft, (ii) the Airframe, (iii) each of the Engines and the APU, (iv) the Parts, (v) the Records; (vi) all present and future Third Party Agreements (including, without limitation, the Aircraft Operating Agreement); (vii) the Associated Rights; and (viii) all Proceeds of the foregoing, it being expressly understood that Mortgagor hereby grants to Lender the power to dispose of the Collateral in accordance with the terms hereof. The foregoing shall not be deemed in any way whatsoever as an agreement by Lender to permit or allow Mortgagor to enter into any Third Party Agreements, and Mortgagor shall only be allowed to enter into any of the foregoing in accordance with the terms of this Agreement. Notwithstanding anything to the contrary contained herein or otherwise, Lender does not by virtue of this Agreement or otherwise assume any obligations, liabilities and/or duties of any kind whatsoever of Mortgagor (and/or of any other Person) under, or with respect to, the Collateral, and Lender shall not be responsible in any way whatsoever for the performance of any obligations, liabilities and/or duties of any kind whatsoever by Mortgagor (and/or by any other Person) in connection with, relating to, or arising under, the Collateral.

        (b)  As collateral security for the prompt and complete payment and performance as and when due of all of the Obligations and in order to induce Lender to enter into this Agreement and make the Loan to Borrower in accordance with the terms hereof, Borrower hereby grants to Lender a first priority security interest in and lien on, and consents to the registration of an international interest in (as applicable), and collaterally assigns to Lender, all of Borrower's right, title and interest in, to and under the Trust Agreement, any trust estate created thereby and any documents or instruments relating thereto (including, without limitation, the Aircraft Operating Agreement) and all of the Collateral (as defined and described in Section 5.1(a), it being expressly understood that Borrower hereby grants to Lender the power to dispose of all of the foregoing in accordance with the terms hereof. The foregoing shall not be deemed in any way whatsoever as an agreement by Lender to permit or allow Borrower to enter into any Third Party Agreements, and Borrower shall only be allowed to enter into any of the foregoing in accordance with the terms of this Agreement. Notwithstanding anything to the contrary contained herein or otherwise, Lender does not by virtue of this Agreement or otherwise assume any obligations, liabilities and/or duties of any kind whatsoever of Borrower (and/or of any other Person) under, or with respect to, the Trust Agreement, the Collateral or any of the other forgoing items, and Lender shall not be responsible in any way whatsoever for the performance of any obligations, liabilities and/or duties of any kind whatsoever by Borrower (and/or by any other Person) in connection with, relating to, or arising under, the Trust Agreement, the Collateral or any of the other foregoing items. Borrower's grant to Lender hereunder with respect to the Aircraft, the Airframe, each of the Engines and the APU, the Parts,

the Records and the Associated Rights is a grant of Borrower's beneficial interest to the same under the Trust Agreement to the extent the same are part of the trust estate under the Trust Agreement.  The parties hereto hereby agree that, as the case and context may require, the term Collateral shall also include all of the items, documents, instruments, agreements rights and interests described in this Section 5.1(b).

    5.2   <u>Lender Appointed as Attorney-in-Fact</u>.  Borrower and Mortgagor hereby irrevocably constitute and appoint Lender and any employee, officer or agent thereof, with full power of substitution, as its/their true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and/or Mortgagor and in the name of Borrower and/or Mortgagor or in its own name, from time to time in Lender's sole discretion, for the purpose of carrying out the terms of this Agreement, and Borrower and Mortgagor hereby further irrevocably authorize Lender and any employee, officer or agent thereof to take any and all appropriate action and to make, execute, deliver, file and/or record any and all instruments or documents (including, without limitation, any FAA filings, UCC financing statements or UCC amendments, Cape Town Convention filings, security interest/lien notifications or notations or any control agreements or any filings/registrations or notifications required under Malaysian law) that may be necessary or desirable to accomplish the purposes of this Agreement or any of the other Loan Documents.  This appointment is coupled with an interest, is irrevocable and shall terminate only upon payment and performance in full of all of the Obligations.  Without limiting the generality of the foregoing, Borrower and Mortgagor hereby further (i) irrevocably ratify the foregoing appointment and authorization and all that Lender or any employee, officer or agent thereof shall lawfully do or cause to be done by virtue of the foregoing, including, without limitation, with regard to the execution, delivery, filing and/or recording of any instruments or documents (including, without limitation, any FAA filings, UCC financing statements or UCC amendments, security interest/lien notifications or notations, Cape Town Convention filings or control agreements or any filings/registrations or notifications required under Malaysian law) and/or the taking of any action as Lender deems necessary or appropriate to carry out the intent of this Agreement and/or any other Loan Documents, (ii) agree that Lender shall have authority, during the continuance of an Event of Default, to endorse Borrower's and Mortgagor's name(s) on any checks, notes, drafts or any other payments or instrument relating to the Collateral that come into Lender's possession or control and to settle, adjust, receive payment and make claim or proof of loss, (iii) agree that Borrower and Mortgagor shall not file or record any corrective or termination statements with respect to any UCC financing statements, amendments or assignments, security interest/lien notifications or notations, Cape Town Convention filings or relevant filings/registrations or notifications under Malaysian law, control agreements filed or recorded by or for the benefit of Lender with respect to any of the Collateral without Lender's prior written consent, and (iv) agree that any signature, execution and delivery of any document or instrument may be satisfied, in Lender's sole discretion and to the extent permitted by the UCC, by authentication of such document or instrument as a record within the meaning of Article 9 of the UCC.  The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower or Mortgagor for any act or failure to act.

    5.3   <u>Inspection</u>.  Lender or its authorized representatives shall have the right, but not the duty, to inspect the Aircraft, any part thereof and/or the Records, at any reasonable time and from time to time, wherever located, upon reasonable prior written notice to Borrower; except that no advance notice shall be necessary prior to any inspection conducted, and such inspection may be conducted at any time, after the occurrence of a Default or an Event of Default.  Upon request of Lender, Borrower and Mortgagor shall promptly provide Lender with notice of the location of the Aircraft and with all Records.  Borrower and Mortgagor shall be responsible for the cost of any inspection conducted after the occurrence of a Default or an Event of Default and shall pay Lender such amount promptly upon demand.  Lender shall be responsible for the cost of any inspection conducted while no Default or Event of Default has occurred and is uncured.

Section 6.  <u>Events of Default</u>.  The term "<u>Event of Default</u>", wherever used herein, shall mean any of the following events or circumstances (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary, or come about or be effected by operation of law, or be pursuant to or in

compliance with any judgment, decree or order of any court or any order, rule or regulation or any administrative or governmental body):

(a)   Borrower and/or Mortgagor shall fail to pay any Obligation within five (5) days after the same shall become due and payable (whether at the stated maturity, by acceleration, upon demand or otherwise); or

(b)   Borrower, Mortgagor and/or any of the Guarantors shall default in the payment or performance of any indebtedness, liability or obligation to Lender or any Affiliate of Lender under any note, security agreement, lease, title retention or conditional sales agreement or any other instrument or agreement and any applicable grace period with respect thereto has expired; or

(c)   Borrower, Mortgagor and/or any of the Guarantors shall be in default in any payment in an amount in excess of US$750,000.00 (or the equivalent) to any Person other than Lender or its Affiliates, and any applicable grace period with respect thereto has expired; or

(d)   Borrower and/or Mortgagor shall fail to keep in full force and effect any of the insurance coverages required under this Agreement, or shall operate the Aircraft at a time when, or at a place in which, such insurance shall not be in effect; or

(e)   Borrower and/or Mortgagor shall use or operate the Aircraft (or allow the same) in violation of Applicable Law; or

(f)   Borrower and/or Mortgagor shall (except as expressly permitted by the provisions of this Agreement) sell, assign, charter, lease, timeshare, pool, interchange, convey, mortgage, consent to the registration of an international interest, execute and deliver an irrevocable de-registration and export request authorization, exchange or otherwise transfer or relinquish possession of or dispose of, or create, assume or suffer to exist any Liens (other than Permitted Liens) on or with respect to, the Aircraft, any part thereof or any of the other Collateral, or Borrower's and/or Mortgagor's interest therein, or attempt or offer to do any of the foregoing, or permit the same to occur; or

(g)   Borrower and/or Mortgagor shall fail to perform or observe any agreement (other than those specifically referred to in this Section 6) required to be performed or observed by it/them under this Agreement or in any of the other Loan Documents, and such failure shall continue uncured for thirty (30) days after written notice thereof from Lender to Borrower (or Mortgagor) (but such notice and cure period will not be applicable unless such breach is curable by practical means within such notice period); or

(h)   any representation or warranty made by Borrower, Mortgagor and/or any of the Guarantors in this Agreement or in any of the other Loan Documents or in any agreement, document or certificate delivered by Borrower, Mortgagor and/or any of the Guarantors in connection herewith or pursuant hereto shall prove to have been incorrect, misleading, or inaccurate in any material respect when such representation or warranty was made or given (or, if a continuing representation or warranty, at any time); or

(i)   Borrower, Mortgagor and/or any of the Guarantors shall (i) generally fail to pay his/its debts as they became due, admit his/its inability to pay his/its debts or obligations generally as they fall due, or shall file a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws or other insolvency laws, or an answer admitting the material allegations of such a petition filed against Borrower, Mortgagor and/or any of the Guarantors in any such proceeding; or (ii) by voluntary petition, answer or consent, seek relief under the provisions of any other bankruptcy or other insolvency or similar law providing for the reorganization or liquidation of individuals, corporations, companies or other legal entities, or providing for an assignment for the benefit of creditors, or providing for an agreement, composition, extension or adjustment with his/its creditors; or

(j)   a petition against Borrower, Mortgagor and/or any of the Guarantors in a proceeding under applicable bankruptcy laws or other insolvency laws, as now or hereafter in effect, shall be filed and shall

not be withdrawn or dismissed within sixty (60) days thereafter, or if, under the provisions of any law providing for reorganization or liquidation of individuals, corporations, companies or other legal entities, that may apply to Borrower, Mortgagor and/or any of the Guarantors, any court of competent jurisdiction shall assume jurisdiction, custody or control of Borrower, Mortgagor and/or any of the Guarantors or of any substantial part of his/its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed or unterminated for a period of sixty (60) days; or

(k)   any judgment, attachment or garnishment in excess of US$750,000.00 (or the equivalent) against Borrower, Mortgagor and/or any of the Guarantors shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days; or

(l)   the occurrence of any of the following events (as applicable): (A) Borrower, Mortgagor and/or any of the Guarantors enters into any transaction of merger, consolidation or reorganization, without the prior written consent of Lender (which consent will not be unreasonably withheld); (B) Borrower, Mortgagor and/or any of the Guarantors cease to do business as a going concern, liquidates, dissolves or sells, transfers or otherwise disposes of all or substantially all of his/its assets or property; (C) Borrower, Mortgagor and/or any of the Guarantors becomes the subject of, or engages in, a leveraged buy-out, without the prior written consent of Lender (which consent will not be unreasonably withheld); (D) Borrower, Mortgagor and/or any of the Guarantors changes the form of organization of its business, without the prior written consent of Lender (which consent will not be unreasonably withheld); or (E) if Borrower, Mortgagor and/or any of the Guarantors is privately owned as of the Closing Date, there is any substantial change in the ownership or control of the capital stock or membership interests of Borrower, Mortgagor and/or any of the Guarantors such that the holder(s) that own or control fifty percent (50%) or more of such equity interests as of the Closing Date no longer do so; or

(m)   this Agreement shall cease to be in full force and effect or shall cease to give Lender the rights and interests purported to be created hereunder, including, without limitation, the failure of the interests granted hereunder to constitute a registered international interest in the Collateral subject to the Cape Town Convention or the Trust Agreement shall cease to be in full force and effect or any default shall occur under the terms of the Trust Agreement and the same shall not have been cured within any applicable grace period (if any); or

(n)   there is a material adverse change in the business, operations or financial condition of Borrower, Mortgagor and/or any of the Guarantors or in his/its ability to comply with the Loan Documents since the Closing Date, or any other event which substantially deprives Lender of what it is entitled to expect under the Loan Documents, as determined by Lender, in its sole discretion and in good faith; or

(o)   the death or judicial declaration of incompetence of Individual Guarantor (and the obligations of Individual Guarantor are not assumed by a party reasonably acceptable to Lender), any repudiation by any of the Guarantors of any of the Guarantors' obligations for the payment or performance of the Obligations or any allegation or determination that the Guaranty is unenforceable in any material respect; or

(p)   any event of default under any lease permitted under Section 4.4(b) or any breach of any representation, warranty or agreement in any consent required under Section 4.4(b) (after giving effect to any notice provisions and/or grace periods provided for therein); or (ii) any event or condition set forth in subsection (i) or (j) of this Section 6 shall occur with respect to a party to any lease permitted under Section 4.4(b), or other disposition permitted thereunder if such other permitted disposition grants to such party the right to use and/or possession thereof having a term in excess of five (5) days; or (iii) any consent required under Section 4.4(b) shall fail to be in full force and effect at any time during the term of this Agreement or cease to give Lender the rights and interests purported to be created thereunder; or

(q)   (i) any event of default under any of the Management Agreement(s) or any breach of any representation, warranty or agreement in any Consent(s) to Management Agreement(s) (after giving effect to any notice provisions and/or grace periods provided therein); or (ii) any event or condition set forth in subsection (i) or (j) of this Section 6 shall occur with respect to any of the Manger(s); or (iii) any of

the Management Agreement(s) shall fail to be in full force and effect at any time during the term of this Agreement; or (iv) any of the Consent(s) to Management Agreement(s) shall fail to be in full force and effect at any time during the term of this Agreement or cease to give Lender the rights and interests purported to be created thereunder; provided, however, if any of the events described in this subsection (q) are with respect to (or are the direct result of) a default by any Manager, Borrower and/or Mortgagor shall have a period of thirty (30) days to cure such default by entering into a new management agreement (acceptable to Lender) with a different manager (acceptable to Lender) and cause such new manager to enter into a Consent to Management Agreement in a form substantially similar to the form entered into by the previous manger and execute any other documents or instruments reasonably required by Lender; or

(r)     Borrower and/or Mortgagor shall not obtain or shall fail to maintain in full force and effect the air service permit (or any equivalent document(s)) issued by the DCA with respect to a foreign registered aircraft being operated, hangared and/or maintained in Malaysia or in the event that the same is required to be renewed from time to time, Borrower and/or Mortgagor shall fail to provide evidence that the same has been renewed at least thirty (30) days prior to the end of the then current term of such air service permit (or any equivalent document(s)); or

(s)     the Collateral or any portion thereof shall be seized, arrested or confiscated by any governmental authority for any reason whatsoever and such Collateral shall not have been released within ten (10) days of any such seizure, arrest, or confiscation.

Section 7. Remedies.

7.1     Termination of Commitment. If an Event of Default specified in Sections 6 (i) or (j) above shall occur, then, and in any such event, the Obligations (including, without limitation, the unpaid principal amount of the Note, together with all accrued but unpaid interest thereon, any prepayment fees and all other amounts due and payable under or with respect to the Loan Documents) shall become immediately due and payable without any notice or other action by Lender. If any other Event of Default shall occur, then, and in any such event, Lender, in its sole discretion, may declare the Obligations to be forthwith due and payable by written notice to Borrower and Mortgagor, whereupon the Obligations (including, without limitation, the unpaid principal amount of the Note, together with all accrued but unpaid interest thereon, any prepayment fees and all other amounts due and payable under or with respect to the Loan Documents), shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Loan Documents to the contrary notwithstanding.  During the continuance of any Event of Default hereunder, Lender shall have the right to pursue and enforce any of its rights and remedies under this Section 7.

7.2     Additional Remedies. If an Event of Default occurs, in addition to all other rights and remedies granted to it in this Agreement and in the other Loan Documents, Lender may exercise all rights and remedies of a secured party under the UCC, the Cape Town Convention or under any other Applicable Law, including, without limitation, all of the rights and remedies set forth in Articles 12, 13, 15 and 20 of the Cape Town Convention, and Borrower and Mortgagor hereby consent to the same.  Without limiting the generality of the foregoing, Borrower and Mortgagor agree that upon the occurrence of an Event of Default, Lender, without demand or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Borrower and Mortgagor or any other Person (all and each of which demands and/or notices are hereby expressly waived), in its sole discretion, may exercise any one or more of the following remedies: (i) proceed at law or in equity, to enforce specifically Borrower's and/or Mortgagor's performance or to recover damages; (ii) terminate or cancel any lease, or any of the Management Agreement(s) and/or charter or any other arrangement then in effect (including any of the same permitted under Section 4.4), without liability, without regard as to the existence of any default or event of default thereunder and recover or cause any such lessee, Manager and/or other party to such arrangement (whichever is then in possession and/or control of the Aircraft) to relinquish possession and return the Aircraft, including Engines, Records and Parts, pursuant to this Section 7.2 and/or exercise any and all other remedies under any consent entered into pursuant to Section 4.4, or in Borrower's or Mortgagor's stead, to the extent provided for under, or otherwise available to Borrower and/or Mortgagor

in connection with such lease, any Management Agreement(s) or other arrangement; (iii) enter the premises where the Aircraft is located and take immediate possession of and remove (or disable in place) the Aircraft (and/or the APU, any Engines and Parts then unattached to the Aircraft) by self-help, summary proceedings or otherwise; (iv) use Borrower's premises for storage; (v) sell, lease, assign or otherwise dispose of the Aircraft (or any Engine, APU or Part) or any of the other Collateral, whether or not in Lender's possession, in one or more parcels, at public or private sale or sales, at such prices as Lender may deem best, or keep the Aircraft idle; (vi) procure the de-registration of the Aircraft, whether by utilizing the IDERA or otherwise; (vii) procure the export and physical transfer of the Aircraft from the territory in which it is situated; (viii) apply any deposit, other cash collateral or any proceeds of any Collateral to reduce any amounts due to Lender; (ix) collect, receive, appropriate and realize upon the Collateral, or any part thereof, including, without limitation, by collecting or receiving any income or profits arising from the management, lease or use of the Collateral; and (x) increase the Interest Rate due under the Note to the Default Rate.  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale, or sales to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Borrower and/or Mortgagor, which right or equity of redemption is hereby expressly released.  Borrower and Mortgagor further agree, at Lender's request, to assemble the Collateral, make it available to Lender at such places as Lender shall reasonably select, whether at Borrower's premises or elsewhere.  Lender shall apply the net proceeds of any such realization (after deducting all reasonable costs and expenses of every kind incurred in connection therewith) to (i) the payment in whole or in part of the Obligations, in such order and manner as Lender may elect, and (ii) the holders of subsequently ranking interests which have been registered with the International Registry or of which Lender has been given notice, in order of priority, with Borrower remaining liable for any deficiency.  After the foregoing application of net proceeds, any remaining balance shall be paid by Lender to Borrower.

To the extent permitted by Applicable Law, Borrower and Mortgagor waive all claims, damages and demands against Lender arising out of the repossession, retention, sale, de-registration, export or other disposition of the Collateral.  Borrower and Mortgagor agree that Lender need not give more than ten (10) Business Days' notice (which notification shall be deemed given when mailed, postage prepaid, addressed to Borrower or Mortgagor at its/their address(es) set forth below its/their signature(s) hereto) of the time and place of any public sale or of the time after which a private sale may take place, or of the time after which the Aircraft will be de-registered and exported and that such notice is reasonable notification of such matters.  Borrower shall be liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Lender is entitled hereunder.

7.3   Relief Pending Final Determination.  Without limiting the generality of Lender's other remedies set forth in this Section 7, in the event Lender adduces evidence of an Event of Default by Borrower and/or Mortgagor, Lender may, pending final determination of its claim, obtain from a court speedy (as defined in Article 20 of the Cape Town Convention) relief in the form of such one or more of the following orders as Lender requests:

(a)   preservation of the Aircraft and its value;
(b)   possession, control or custody of the Aircraft;
(c)   immobilization of the Aircraft;
(d)   lease or, except where covered by sub-paragraphs (a) to (c), management of the Aircraft and the income therefrom; and
(e)   if at any time Borrower (or Mortgagor) and Lender specifically agree, sale and application of proceeds therefrom.

In furtherance thereof, Lender, Borrower and Mortgagor hereby agree to exclude the application of paragraph 4 of Article 20 of the Cape Town Convention.  Nothing in this Section 7.3 shall limit the availability to Lender of other forms of interim relief.

7.4   No Waiver: Cumulative Remedies.  No failure or delay on the part of Lender in exercising any right hereunder or under the Note or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or thereunder preclude any other or further

exercise thereof or the exercise of any other right, power or privilege.  No right or remedy in this Agreement or in any of the other Loan Documents is intended to be exclusive but each shall be cumulative and in addition to any other right or remedy hereunder or under the other Loan Documents or otherwise available to Lender at law or in equity, including, such rights and remedies as are provided for in the Cape Town Convention and the UCC.  The exercise by Lender of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other remedies.  No express or implied waiver by Lender of any Default or Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.  After the occurrence of any Default or Event of Default, the acceptance by Lender of any installment of principal and/or interest or of any other sum owing hereunder or under the other Loan Documents shall not constitute a waiver of such Default or Event of Default, regardless of Lender's knowledge or lack of knowledge thereof at the time of acceptance of any such payment and shall not constitute a reinstatement of this Agreement if Lender has sent Borrower a notice of default, unless Lender shall have agreed in writing to reinstate this Agreement and waive the Default or Event of Default.  To the extent permitted by Applicable Law, Borrower and Mortgagor waive any rights now or hereafter conferred by statute or otherwise that limit or modify any of Lender's rights or remedies under this Agreement.

Section 8.  Miscellaneous.

8.1   Notices.  All communications and notices provided for herein shall be in writing and shall be deemed to have been duly given or made (i) upon hand delivery, or (ii) upon delivery by an overnight delivery service, or (iii) four (4) Business Days after being deposited in the United States of America mail, return receipt requested, first class postage prepaid, and addressed to Lender, Borrower or Mortgagor at their respective addresses set forth under their signatures hereto or such other address as either party may hereafter designate by written notice to the other, or (iv) when sent by telecopy (with customary confirmation of receipt of such telecopy) on the Business Day when sent or upon the next Business Day if sent on other than a Business Day.

8.2   Expenses and Fees; Indemnity; Performance of Borrower's Obligations.

(a)   Borrower and/or Mortgagor shall pay to Lender upon demand all fees, costs and expenses incurred by or on behalf of Lender at any time in connection with (i) the negotiation, preparation, execution, delivery and enforcement of this Agreement and the other Loan Documents and the collection of the Obligations, (ii) the creation, preservation and protection of the Collateral and Lender's first priority and only security interest therein, (iii) the registration of an international interest with the International Registry and each of Borrower's and Mortgagor's registration as a transacting user entity with the International Registry and/or Borrower's and Mortgagor's appointment of an administrator or a professional user entity to facilitate filings with the International Registry, or (iv) Borrower's and/or Mortgagor's exercise of any right granted under, or any amendment or other modification to any of, the Loan Documents.  Such fees, costs and expenses shall include, without limitation, appraisal and inspection fees, the fees and expenses of FAA Counsel and of Lender's counsel, consultants and brokers, UCC, FAA, International Registry and other applicable title and lien searches, and costs and expenses relating to recovery, repossession, storage, insurance, transportation, repair, refurbishment, advertising, sale and other disposition of the Aircraft.  Borrower and/or Mortgagor shall also pay all fees (including license, filing and registration fees), taxes, assessments, duties and other charges of whatever kind or nature that may be payable or determined to be payable in connection with the execution, delivery, recording or performance of this Agreement or any of the other Loan Documents.

(b)   Borrower and Mortgagor shall indemnify, protect, save, defend and keep harmless Lender, Lender's Affiliates and all of Lender's and such Affiliate's respective directors, shareholders, officers, employees, agents, predecessors, attorneys-in-fact, lawyers, successors and assigns (each an "Indemnitee") on a net after-tax basis, from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, demands, costs, expenses and disbursements (including, without limitation, legal fees and expenses) of any kind and nature whatsoever (collectively, "Claims") that may be imposed on, incurred by or asserted against any Indemnitee, whether or not such Indemnitee shall also be indemnified as to any such Claim by any other Person, in any way relating to,

arising out of or in connection with (a) this Agreement or any of the other Loan Documents, including, without limitation, the execution, delivery, breach (including any Default or Event of Default), enforcement, performance or administration of this Agreement or any of the other Loan Documents, (b) the Collateral, including, without limitation, the perfection, maintenance, protection or realization upon the Collateral or any other security for the Obligations, or (c) without limiting the provisions of clause (b) above, the Aircraft, including the manufacture, inspection, construction, purchase, acceptance, rejection, ownership, management, pooling, interchange, chartering, titling or re-titling, delivery, lease, sublease, possession, use, operation, maintenance, condition, registration or re-registration, sale, removal, repossession, storage or other disposition of the Aircraft or any part thereof or any accident in connection therewith (including Claims involving or alleging environmental damage, criminal acts, hijacking, acts of terrorism or similar acts, product liability or strict or absolute liability in tort, latent and other defects (whether or not discoverable), for patent, trademark or copyright infringement). Notwithstanding the foregoing, Borrower and Mortgagor shall not be required to indemnify an Indemnitee under this Section 8.2 for any Claim caused by the gross negligence or willful misconduct of such Indemnitee. If any Claim is made against Borrower, Mortgagor and/or any Indemnitee, the party receiving notice of such Claim shall promptly notify the other, but the failure of the party receiving notice to so notify the other shall not relieve Borrower and/or Mortgagor of any obligation hereunder.

(c)   If Borrower and/or Mortgagor fail to perform or comply with any of its/their agreements contained herein or in the other Loan Documents, including, without limitation, its/their obligations to keep the Aircraft free of Liens, comply with Applicable Standards, or obtain the requisite insurance coverages, Lender shall have the right, but shall not be obligated, to effect such performance or compliance, with such agreement. Any expenses of Lender incurred in connection with effecting such performance or compliance, together with interest thereon at the Default Rate from the date incurred until reimbursed, shall be payable by Borrower and Mortgagor to Lender promptly on demand and until such payment shall constitute part of the Obligations secured hereby. Any such action shall not be a cure or waiver of any Default or Event of Default hereunder.

8.3   **Entire Agreement; Modifications.**   This Agreement and the other Loan Documents constitute the entire understanding and agreement of the parties hereto with respect to the matters contained herein and shall completely and fully supersede all other prior agreements (including any proposal letter, commitment letter, and/or term sheet), both written and oral, between Lender and Borrower relating to the Obligations. Neither Lender nor Borrower shall hereafter have any rights under such prior agreements but shall look solely to this Agreement and the other Loan Documents for the definition and determination of all of their respective rights, liabilities and responsibilities relating to the Obligations. Neither this Agreement, nor any terms hereof, may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of a change, waiver, discharge or termination is sought.

8.4   **Further Documentation.**   The parties hereto agree that from time to time after the Closing Date, each party shall execute and deliver to the other party(ies) such further document or documents as such other party(ies) may reasonably request and which is or are necessary or desirable in order to confirm, or further evidence the respective obligations, rights and privileges of each party under this Agreement or the other Loan Documents, or carry out the intent of the parties under this Agreement or the other Loan Documents. Without limiting the generality of the foregoing, the parties hereto undertake to enter into, execute and deliver such documents as may be necessary or desirable to constitute an international interest under the Cape Town Convention. Particularly in the case of any change, waiver, discharge or termination pursuant to Section 8.3 hereof, the parties undertake to enter into, execute and deliver such documents as may be necessary or desirable to enhance the enforceability of the commercial agreements of the parties under the Cape Town Convention to the greatest extent permitted under the Cape Town Convention, such that Lender's priority position should not be prejudiced thereby.

8.5   **Construction of this Agreement and Related Matters; Borrower and Mortgagor Obligations.**   All representations and warranties made in this Agreement and in the other Loan Documents shall survive the execution and delivery of this Agreement and the making of the Loan hereunder. Borrower's and Mortgagor's obligations contained in Section 8.2 hereof shall survive the payment and performance of the

Obligations and the termination of this Agreement. This Agreement may be executed by the parties hereto on any number of separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. The headings of the Sections hereof are for convenience only, are not part of this Agreement and shall not be deemed to affect the meaning or construction of any of the provisions hereof. Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender. Time is of the essence in the payment and performance of all of Borrower's and Mortgagor's obligations under this Agreement. Any provision of this Agreement that may be determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective in such jurisdiction to the extent thereof without invalidating the remaining provisions of this Agreement, which shall remain in full force and effect. The Usury Savings Provisions set forth in the Note are incorporated herein and in all Loan Documents for all purposes. In the event of any conflict between any Cape Town Convention provisions in this Agreement and any provisions in this Agreement not related to the Cape Town Convention, the provisions relating to the Cape Town Convention shall prevail. The parties hereto hereby agree that Borrower shall be directly and primarily liable for all statements, representations, warranties, covenants, agreements, indemnifications and obligations stated to be those of Mortgagor hereunder.

8.6   Lender's Assignment.   Lender, may at any time, with or without notice to Borrower or Mortgagor, grant a security interest in, sell, assign or otherwise transfer (an "Assignment") all or any part of its interest in this Agreement and the other Loan Documents or any amount due or to become due hereunder or thereunder, including, without limitation, the Associated Rights, and Borrower and Mortgagor shall perform all of its/their obligations under the Loan Documents, to the extent so transferred, for the benefit of the beneficiary of such Assignment (such beneficiary, including any successors and assigns, an "Assignee"); provided, however, that (a) any such Assignment shall not impose any greater obligation on the Borrower and/or the Mortgagor than the obligations set forth herein and in the other Loan Documents; (b) any such Assignment shall not increase the tax liabilities of the Borrower or the Mortgagor resulting from this Agreement and the other Loan Documents; and (c) Lender shall pay all out-of-pocket fees and expenses of Borrower and Mortgagor in connection with such Assignment, including, but not limited to, any legal fees and expenses and costs of any additional filings. Borrower and Mortgagor hereby consent to such Assignment, including, without limitation, the assignment of the Associated Rights and the related international interests. Borrower and Mortgagor hereby waive any right to assert, and agree not to assert, against any Assignee any abatement, reduction, defense, setoff, recoupment, claim or counterclaim that Borrower or Mortgagor may have against Lender, other than defenses arising from fraudulent acts on the part of Assignee; provided, however, that, notwithstanding an assumption by an Assignee of Lender's obligations as set forth in the immediately succeeding sentence, such assumption shall not terminate the Lender's liability to Borrower and/or Mortgagor, if any, with respect to such claim or counterclaim and such assumption shall not terminate or constitute a waiver of Borrower's and/or Mortgagor's rights against Lender with respect to any existing right of abatement, reduction, defense or recoupment. Upon the express assumption by such Assignee of Lender's obligations hereunder, Lender shall be relieved of any such assumed obligations. If so directed in writing, Borrower and Mortgagor shall pay all amounts due or to become due under the Loan Documents directly to the Assignee or any other party designated in writing by Lender. Borrower and Mortgagor acknowledge and agree that Lender's right to enter into an Assignment is essential to Lender and, accordingly, waive any restrictions under Applicable Law with respect to an Assignment and any related remedies. Lender shall, acting for this purpose as an agent of Borrower and Mortgagor, maintain at its offices a register for the recordation of the names and addresses of its participants or assignees, and the amount and terms of its participations and assignments including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such participation or assignment. Upon the request of Lender or any Assignee, Borrower and Mortgagor agree (a) to promptly execute and deliver to Lender or to such Assignee an acknowledgment of assignment in form and substance satisfactory to the requesting party, an insurance certificate naming Assignee as additional insured and loss payee and otherwise evidencing the insurance coverages required hereby and such other documents and assurances reasonably requested by Lender or Assignee, and (b) to comply with the reasonable requirements of any such Assignee in order to perfect such Assignee's security interest and lien on the Collateral and register such Assignee's international interest with the International Registry.

8.7   Jurisdiction.  Borrower and Mortgagor hereby irrevocably consent and agree that any legal action, suit or proceeding arising out of or in any way in connection with this Agreement or any of the other Loan Documents may be instituted or brought in the courts of the State of Illinois or any Federal court sitting in Cook County, Illinois, as Lender may elect or in any other state, federal or foreign court as Lender shall deem appropriate (including, without limitation any applicable courts in Malaysia), and by execution and delivery of this Agreement, Borrower and Mortgagor irrevocably accept and submit to, for itself/themselves and in respect of its/their property, generally and unconditionally, the non-exclusive jurisdiction of any such court, and to all proceedings in such courts.  Borrower and Mortgagor irrevocably consent to service of any summons and/or legal process by first class, certified United States of America air mail, postage prepaid, to Borrower and/or Mortgagor at the address(es) set forth below its/their signatures hereto, such method of service to constitute, in every respect, sufficient and effective service of process in any such legal action or proceeding.  Nothing in this Agreement or in any of the other Loan Documents shall affect the right to service of process in any other manner permitted by law or limit the right of Lender to bring actions, suits or proceedings in the courts of any other jurisdiction.  Borrower and Mortgagor further agree that final judgment against it/them in any such legal action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, within or outside the United States of America, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of the liability.  Borrower and Mortgagor each hereby irrevocably designates, appoints and empowers CT Corporation System at its authorized agent for service of process in the State of Illinois in any suit or proceeding with respect to this Agreement or the other Loan Documents.

8.8   Governing Law; Binding Effect.  This Agreement shall be construed and enforced in accordance with, and the rights of all of the parties shall be governed by, the internal laws of the State of Illinois (without regard to the conflict of laws principles of such state), including all matters of construction, validity, and performance.  This Agreement shall be binding upon and inure to the benefit of Borrower, Mortgagor and Lender and their respective successors and assigns, except that Borrower and Mortgagor may not assign or transfer its rights hereunder or any interest herein.

8.9   Jury Waiver.  BORROWER AND MORTGAGOR EACH HEREBY KNOWINGLY AND FREELY WAIVES ITS RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT OR PROCEEDING RELATING TO, ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.

8.10   Customer Identification - USA Patriot Act Notice; OFAC and Bank Secrecy Act.  Lender hereby notifies Borrower, Mortgagor and Guarantors that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and the Lender's policies and practices, the Lender is required to obtain, verify and record certain information and documentation that identifies each of the Borrower, Mortgagor and Guarantors, which information includes the name and address of each of the Borrower, Mortgagor and Guarantors and such other information that will allow the Lender to identify each of the Borrower, Mortgagor and Guarantors in accordance with the Act.  In addition, Borrower and Mortgagor shall (a) ensure that no Person who owns a controlling interest in or otherwise controls Borrower, Mortgagor, any of the Guarantors or any Subsidiary of Borrower is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause any of its subsidiaries to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

8.11   Counterparts; Facsimile Signatures; Other Electronic Transmissions.  This Agreement and all other Loan Documents, and any notices to be given pursuant to this Agreement, may be executed and delivered by telecopier, facsimile or other electronic transmission (i.e. PDF format) all with the same force and effect as if the same was a fully executed and delivered original counterpart.  The original counterparts of this Agreement and all Loan Documents shall be delivered by Borrower and Mortgagor

promptly after execution, but failure to deliver shall in no way limit or negate enforceability of any Loan Document.

8.12 <u>Currency</u>. The payment obligations under this Agreement and the other Loan Documents shall not be discharged by an amount paid in currency other than United States Dollars, whether pursuant to a judgment or otherwise. To the extent that the amount so paid on prompt conversion to United States Dollars and transferred to the specified place of payment under normal banking procedures does not yield the amount of United States Dollars in such place due under this Agreement and the other Loan Documents, the payor shall indemnify the payee and any obligee against any such shortfall. In the event that any payment, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in the payment of such amount of United States Dollars in the specified place of payment, the obligee of such payment shall have a claim against the payor for the additional amount necessary to yield the amount due and owing under this Agreement and the other Loan Documents and the same shall be a separate cause of action.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers and seal (as applicable) as of the date first above written.

**MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.,** MERRILL LYNCH CAPITAL DIVISION

By:_____
Name:
Title:

Notice Address:
Merrill Lynch Capital – Equipment Finance Group
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601 USA
Attn:  Managing Director
Facsimile:  312-750-6108
Telephone: 312-750-6274

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a Trust Agreement dated as of April ____, 2006, with Wijaya Baru Aviation SDN. BHD., as the beneficiary and settlor of such trust)

By:_____
Name:
Title:

Notice Address:
Wells Fargo Bank Northwest, National Association
299 South Main Street, 12th Floor
Salt Lake City, Utah 84111 USA
Attn:  Corporate Trust Department MAC: U1228-120
Telephone:  801-246-5300
Facsimile:   801-246-5053

The Common Seal of                              )
**WIJAYA BARU AVIATION SDN. BHD.**      )
(Company No. 362080-U)                       )
Was hereunto affixed in accordance with   )
Its Articles of Association                        )
in the presence of:                                )

_____
Director

_____
Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn:  Stephen Abook
Telephone:  011-603-77813779
Facsimile:   011-603-77853117

ATTESTATION/AUTHENTICATION

I, __FARHAH HAYATI MAMAT_____, an Advocate and Solicitor of the High Court of Malaya practising at
_____Kuala Lumpur_____, hereby certify that on this ____ day of **0 5 APR 2006**, 2006,
the common seal of **WIJAYA BARU AVIATION SDN. BHD.** (362080-U) was duly affixed to the above written
instrument in my presence in accordance with its Articles of Association.

Dated this ____ day of **0 5 APR 2006**_____, 2006.

Witness my hand

_____
Advocate & Solicitor

FARHAH HAYATI MAMAT
ADVOCATES & SOLICITOR
KUALA LUMPUR

300518

(LOAN AGREEMENT)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers and seal (as applicable) as of the date first above written.

MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., MERRILL LYNCH CAPITAL DIVISION

By:_____
Name:
Title:

Notice Address:
Merrill Lynch Capital – Equipment Finance Group
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601
Attn:  Managing Director
Facsimile:   312-750-6108

WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a Trust Agreement dated as of March  12, 2006, with Wijaya Baru Aviation SDN. BHD., as the beneficiary and settlor of such trust)

By:_____
Name:   Jon Croasmun
Title:   Assistant Vice President

Notice Address:
Wells Fargo Bank Northwest, National Association
299 South Main Street, 12th Floor
Salt Lake City, Utah 84111
Attn:  Corporate Trust Department MAC: U1228-120
Telephone: 801-246-5300
Facsimile:   801-246-5053

The Common Seal of                                    )
**WIJAYA BARU AVIATION SDN. BHD.**      )
(Company No. 362080-U)                         )
Was hereunto affixed in accordance with   )
Its Articles of Association                          )
in the presence of:                                    )

_____
Director

_____
Director

Notice Address:
5th Floor, Wijaya International Medical Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn:  Stephen Abook
Telephone:  011-603-77813779
Facsimile:  011-603-77853117

300518

(LOAN AGREEMENT)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers and seal (as applicable) as of the date first above written.

**MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**, MERRILL LYNCH CAPITAL DIVISION

By: *Pamela A Lenamon*
Name: PAMELA A LENAMON
Title: V. P.

Notice Address:
Merrill Lynch Capital – Equipment Finance Group
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601 USA
Attn: Managing Director
Facsimile:   312-750-6108
Telephone: 312-750-6274

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a Trust Agreement dated as of April ____, 2006, with Wijaya Baru Aviation SDN. BHD., as the beneficiary and settlor of such trust)

By:_____
Name:
Title:

Notice Address:
Wells Fargo Bank Northwest, National Association
299 South Main Street, 12th Floor
Salt Lake City, Utah 84111 USA
Attn: Corporate Trust Department MAC: U1228-120
Telephone: 801-246-5300
Facsimile:   801-246-5053

The Common Seal of                                         )
**WIJAYA BARU AVIATION SDN. BHD.**     )
(Company No. 362060-U)                             )
Was hereunto affixed in accordance with   )
Its Articles of Association                              )
In the presence of:                                        )

_____

Director

_____

Director

Notice Address:
5th Floor, Wijaya International Medical
Center
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan, Malaysia
Attn: Stephen Abook
Telephone: 011-603-77813779
Facsimile:   011-603-77853117

(LOAN AGREEMENT)

ANNEX A

## DEFINITIONS

The following terms shall have the following meanings for all purposes of this Agreement:

Affiliate shall mean, with respect to either Lender or Borrower, as applicable, any affiliated Person controlling, controlled by or under common control with such party, and for this purpose, 'control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any such Person, whether through the legal or beneficial ownership of voting securities, by contract or otherwise.

Aircraft shall mean (i) the Airframe, (ii) the Engines, (iii) any APU, and (iv) the Records, and all accessories, additions, accessions, alterations, modifications, Parts, repairs and attachments now or hereafter affixed thereto or used in connection therewith, and all replacements, substitutions and exchanges (including trade-ins) for any of the foregoing.

Aircraft Operating Agreement means that certain Aircraft Operating Agreement dated as of April 12 , 2006, by and between Borrower and Wells Fargo Bank Northwest, National Association, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as Owner Trustee under the Trust Agreement, which provides Borrower the right to use and operate the Aircraft.

Airframe shall mean (i) the Aircraft described in Annex C hereto and shall not include the Engines or any APU, it being the intent that separate rights shall attach to the Airframe separate and apart from the Engines for purposes of the Cape Town Convention, and (ii) any and all Parts from time to time incorporated in, installed on or attached to the Aircraft and any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after removal from the Aircraft.

Applicable Law shall mean all applicable laws, statutes, treaties, conventions (including, without limitation, the Cape Town Convention), judgments, decrees, injunctions, writs and orders of any court, governmental agency or authority and rules, regulations (including, without limitation, the International Registry Regulations), procedures (including, without limitation, the International Registry Procedures), orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority as amended and revised, and any judicial or administrative interpretation, of any of the same (including, without limitation, any of the same required by the FAA or the DCA), including the airworthiness certificate issued with respect to the Aircraft, all FARs, airworthiness directives, and/or any of the same relating to noise, the environment, national security, public safety, exports or imports or contraband (including, without limitation, any of the foregoing with respect to the United States of America, Malaysia and any other applicable jurisdiction(s)).

Applicable Standards shall mean (i) Applicable Law, (ii) the requirements of the insurance policies required hereunder, and (iii) with respect to the Airframe or any Engine, APU or Part, all compliance requirements set forth in or under (A) all maintenance manuals initially furnished with respect thereto, including any subsequent amendments or supplements to such manuals issued by the manufacturer or supplier thereof from time to time, (B) all mandatory service bulletins issued, supplied, or available by or through the applicable manufacturer with respect thereto, (C) all applicable airworthiness directives issued by the FAA or similar regulatory agency having jurisdictional authority, (D) all conditions to the enforcement of any warranties pertaining thereto, (E) Borrower's (or Mortgagor's) FAA approved maintenance program with respect to the Airframe, the Engines, any APU or Part, and (F) any Computerized Maintenance Monitoring Program or Engine Maintenance Program.

APU shall mean (i) any auxiliary power unit described in Annex C hereto and installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to

(LOAN AGREEMENT)

time; (ii) any auxiliary power unit that may from time to time be substituted, pursuant to the applicable terms of this Agreement, for an APU; and (iii) any and all Parts incorporated in or installed on or attached to such auxiliary power unit or any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

Associated Rights means all rights to payment or other performance by Borrower or Mortgagor under an agreement which is secured by or associated with the Aircraft.

Business Day shall mean any day other than a Saturday, Sunday or other day on which banks located in Chicago, Illinois are closed or are authorized to close.

Cape Town Convention shall mean, collectively, the official English language text of the Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa. Any reference in this Agreement to a provision, section or article of the Cape Town Convention shall be a reference to the Consolidated Text of the Cape Town Convention and to the corresponding provision, section or article of the documents described in the immediately preceding sentence from which the Consolidated Text of the Cape Town Convention is derived.

Collateral shall have the meaning set forth in Section 5.1 hereof.

Commitment Fee shall mean a fee in the amount set forth on Annex B hereto.

Computerized Maintenance Monitoring Program shall mean any automated on-line maintenance tracking program with respect to the Airframe provided by the manufacturer of the Airframe or by a third party, such as CAMP, that is approved by Lender and which makes data with respect to the Aircraft available to Lender.

Consent(s) to Management Agreement(s) shall mean (individually or collectively, as the applicable case and context may require) (i) the Consent To Aircraft Management Agreement and Assignment by and among Lender, Borrower and DNEST Aviation Services Sdn. Bhd., with respect to the Management Agreement for the Aircraft with DNEST Aviation Services Sdn. Bhd.; (ii) the Consent To Aircraft Management Agreement and Assignment by and among Lender, Borrower, ACI Pacific, LLC and Wijaya Baru Medical Services Sdn. Bhd., with respect to the Management Agreement for the Aircraft with ACI Pacific, LLC; and/or (iii) the Consent To Aircraft Management Agreement and Assignment by and among Lender, Borrower and Aviation Concepts, Inc., with respect to the Management Agreement for the Aircraft with Aviation Concepts, Inc.

DCA shall mean the Malaysian Civil Aviation Department or any Person, governmental department, bureau, authority, commission or agency succeeding the functions of any of the foregoing or otherwise having authority over civil aircraft in Malaysia.

Default shall mean an event or circumstance that, after the giving of notice or lapse of time, or both, would become an Event of Default.

Default Rate shall mean the Default Rate as defined in the Note.

Engine shall mean (i) each of the engines as described in Annex C hereto and installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to time, it being the intent that separate rights shall attach to the Engines separate and apart from the Airframe for purposes of the Cape Town Convention; (ii) any engine that may from time to time be substituted, pursuant to the applicable terms of this Agreement, for an Engine; and (iii) any and all Parts incorporated in or installed on or attached to such engine or any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

(LOAN AGREEMENT)

Engine Maintenance Program shall mean the Engines' power by the hour engine maintenance program provided by the Engines' manufacturer or by Jet Support Services, Inc.

Event of Default shall have the meaning set forth in Section 6 hereof.

Event of Loss with respect to the Aircraft, the Airframe, any Engine or any APU shall mean any of the following events: (i) loss of such property or the use thereof due to theft, disappearance, destruction, damage beyond repair or rendition of such property permanently unfit for normal use for any reason whatsoever; (ii) any damage to such property that results in an insurance settlement with respect to such property on the basis of a total loss or constructive total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, such property by the act of any government (foreign or domestic) or of any state or local authority or any instrumentality or agency of the foregoing ("Requisition of Use"); (iv) as a result of any rule, regulation, order or other action by any government (foreign or domestic) or governmental body (including, without limitation, the FAA or any similar foreign governmental body) having jurisdiction, the use of such property shall have been prohibited, or such property shall have been declared unfit for use, for a period of six (6) consecutive months, unless Borrower and/or Mortgagor, prior to the expiration of such six-month period, shall have undertaken and, in the opinion of Lender, shall be diligently carrying forward all steps that are necessary or desirable to permit the normal use of such property by Borrower and/or Mortgagor or, in any event, if use shall have been prohibited, or such property shall have been declared unfit for use, for a period of twelve (12) consecutive months; (v) with respect to an Engine or an APU, the removal thereof from the Airframe for a period of six (6) consecutive months or longer, whether or not such Engine or APU is operational; or (vi) an Engine or an APU is returned to the manufacturer thereof, other than for modification in the event of patent infringement or for repair or replacement (any such return being herein referred to as a "Return to Manufacturer").   The date of such Event of Loss shall be the date of such theft, disappearance, destruction, damage, Requisition of Use, prohibition, unfitness for use for the stated period, removal for the stated period or Return to Manufacturer.

FAA shall mean the United States of America Federal Aviation Administration and/or the Administrator of the Federal Aviation Administration and the Department of Transportation, or any Person, governmental department, bureau, authority, commission or agency succeeding the functions of any of the foregoing, including, where applicable, the Transportation Security Administration.

FAA Counsel shall mean such counsel as Lender may designate from time to time to assist it with FAA matters and International Registry matters.

FARs shall mean the United States of America Federal Aviation Regulations, any supplemental Federal Aviation Regulations and all successor regulations thereto.

Federal Aviation Act shall mean Subtitle VII of Title 49 of the United States Code, as amended and recodified.

GAAP shall mean financial statements and/or other financial information prepared in accordance with the provisions of the Companies Act, 1965 and MASB Approved Accounting Standards in Malaysia.

Guarantor(s) shall mean either individually or collectively, as the applicable case and context may require, Dato' Seri Tiong King Sing (Date of Birth September 3, 1961, with Malaysia Passport number K10647373) ("Individual Guarantor"), WIJAYA BARU HOLDINGS SDN. BHD. and KUALA DIMENSI SDN. BHD.

Guaranty shall mean the Agreement of Guaranty executed by the Guarantors in favor of Lender with respect to the Obligations.

IDERA shall mean an Irrevocable De-Registration and Export Request Authorization substantially in the form of Annex E hereto.

Impositions shall have the meaning set forth in Section 4.3 hereof.

(LOAN AGREEMENT)

International Registry shall mean the international registry located in Dublin, Ireland, established pursuant to the Cape Town Convention.

International Registry Procedures shall mean the official English language text of the Procedures for the International Registry issued by the supervisory authority thereof pursuant to the Cape Town Convention.

International Registry Regulations shall mean the official English language text of the Regulations of the International Registry issued by the supervisory authority thereof pursuant to the Cape Town Convention.

Lease shall mean the aircraft lease agreement between the Borrower and Wijaya Baru Medical Services Sdn. Bhd.

Liens shall mean all liens, charges, security interests, national interests, prospective international interests, international interests, leaseholds and encumbrances of every nature and description whatever, whether consensual or nonconsensual, including, without limitation, any rights of third parties under Third Party Agreements and irrevocable de-registration and export request authorizations.

Loan Documents shall mean this Agreement, the Note, the Guaranty, each of the Consent(s) to Management Agreement(s), the Trust Agreement any consent(s) to lease(s) required pursuant to Section 4.4 and any other documents, agreements or instruments securing, evidencing or relating to the Obligations.

Management Agreement(s) shall mean (individually or collectively, as the applicable case and context may require) (i) the management agreement between DNEST Aviation Services Sdn. Bhd. and Borrower, with respect to the management and operation of the Aircraft; (ii) the management agreement between ACI Pacific, LLC, Borrower and Wijaya Baru Medical Services Sdn. Bhd., with respect to the management and operation of the Aircraft; and/or (iii) the operating/management/charter agreement between Aviation Concepts, Inc. and Borrower, with respect to the operation of the Aircraft pursuant to FAR·Part 135.

Manager(s) shall mean (individually or collectively, as the applicable case and context may require) (i) DNEST Aviation Services Sdn. Bhd.; (ii) ACI Pacific, LLC.; and/or (iii) Aviation Concepts, Inc.

Material Damage shall mean any damage: (i) required to be reported pursuant to any governmental reporting requirement, (ii) with respect to which an insurance claim is being made, or (iii) requiring that the Aircraft or any Engine be taken out of service for more than five (5) days to repair.

Obligations shall mean: (i) the unpaid principal amount of, and accrued interest on, the Note; and (ii) all other indebtedness, obligations or liabilities of Borrower and/or Mortgagor owing to Lender, or to any Affiliate of Lender, of every kind and description, direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising, including, but not limited to, all indebtedness, obligations or liabilities under, arising out of or in connection with this Agreement, the Note or any of the other Loan Documents.

Parts shall mean all appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines) that may from time to time be incorporated or installed in or attached to the Airframe, any Engine or any APU, and any and all such appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment removed therefrom so long as Lender shall retain a security interest therein in accordance with the applicable terms of this Agreement after such removal.

Permitted Liens shall mean (i) the respective rights of others under Third Party Agreements, if any, to the extent expressly provided and permitted by the terms of Section 4.4 of this Agreement, including, without limitation, the Lease, (ii) Liens for taxes either not yet due or being contested by Borrower or Mortgagor in good faith with due diligence and by appropriate proceedings, so long as such proceedings do not involve, in Lender's sole judgment, any material danger of the sale, foreclosure, transfer, forfeiture or loss of the

Collateral, or title thereto, the rights of Lender hereunder or Lender's interest therein, and for the payment of which taxes adequate reserves shall have been established in accordance with GAAP or other appropriate provisions satisfactory to Lender have been made, and (iii) inchoate materialmen's, mechanic's, workmen's, repairmen's, employee's, or other like Liens arising in the ordinary course of business of Borrower or Mortgagor for sums not yet delinquent or being contested in good faith with due diligence and by appropriate proceedings, so long as such proceedings do not involve, in Lender's sole judgment, any material danger of the sale, foreclosure, transfer, forfeiture or loss of the Collateral, or title thereto, the rights of Lender hereunder or Lender's interest therein, and for the payment of which sums adequate reserves shall have been established in accordance with GAAP or other appropriate provisions satisfactory to Lender have been made.

Person shall mean any individual, partnership, corporation, limited liability company, private limited company, trust, association, joint venture, joint stock company, or non-incorporated organization or government or any department or agency thereof, or any other entity of any kind whatsoever.

Proceeds shall mean "proceeds" as defined in the UCC and in the Cape Town Convention, and in any event, shall include, but not be limited to, all goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights, investment property and supporting obligations (to the extent any of the foregoing terms are defined in the UCC, any such foregoing terms shall have the meanings given to the same in the UCC), and Associated Rights, and all of Borrower's and/or Mortgagor's rights in and to any of the foregoing, and any and all rents, payments, charter hire and other amounts of any kind whatsoever due or payable under or in connection with the Aircraft, including, without limitation, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower or Mortgagor from time to time with respect to the Aircraft, including, without limitation, money or non-money proceeds of the Aircraft arising from the total or partial loss or physical destruction of the Aircraft, (ii) any and all payments (in any form whatsoever) made or due and payable to Borrower or Mortgagor from time to time in connection with any total or partial requisition, confiscation, condemnation, seizure or forfeiture of the Aircraft by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of governmental authority), and (iii) any and all other rents or profits or other amounts from time to time paid or payable under or in connection with the Aircraft.

Purchase Agreement means that certain Aircraft Purchase Agreement dated September 2, 2005, by and between Borrower and Vendor, with respect to the Aircraft (along with all schedules, attachments and exhibits thereto), as the same may be or has been amended from time to time.

Records shall mean any and all logs, manuals, certificates and data and inspection, modification, maintenance, engineering, technical, and overhaul records (whether in written or electronic form) with respect to the Aircraft, including, without limitation, all records (i) required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or by any manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, all records (ii) evidencing Borrower's or Mortgagor's (or any Manager's) compliance with Applicable Standards, and (iii) with respect to any manufacturer's maintenance service program for the Airframe or Engines, including, without limitation, any Computerized Maintenance Monitoring Program or Engine Maintenance Program. All Records shall be kept in consecutive order and shall be written in English (dual language Records are permitted).

Third Party Agreements shall mean any and all leases, operating agreements, subleases, management agreements, interchange agreements, charter agreements, pooling agreements, timeshare agreements, overhaul agreements, repair agreements and any other similar agreements or arrangements of any kind whatsoever relating to the Aircraft or any part thereof.

Trust Agreement shall mean that certain Trust Agreement dated as of April 12, 2006, by and between Borrower and Wells Fargo Bank Northwest, National Association, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" as provided in the Trust Agreement (known and denominated as the Wijaya

(LOAN AGREEMENT)

Baru Aircraft Trust, which Trust Agreement has been entered into to create a trust whereby the Aircraft will be contributed into such trust in order to ensure the eligibility of the Aircraft for United States of America registration with the FAA. The term Trust Agreement shall also mean any other documents or instruments entered into by and between Borrower and Mortgagor in connection with the Trust Agreement.

UCC shall mean the applicable Uniform Commercial Code as then in effect in the applicable jurisdiction.

Usury Savings Provisions shall mean the Usury Savings Provisions as defined and set forth in the Note.

Vendor shall mean Learjet Inc.

(LOAN AGREEMENT)

ANNEX B

## AIRCRAFT, FINANCIAL AND INSURANCE INFORMATION

Airframe Flight Hours Limitation:     450 flight hours per year

Per Hour Charge:                      $475.00

Principal Amount of the Loan:         $8,725,000.00

Commitment Fee:                       $52,350.00

Required Liability and Damage Insurance Coverage:

    (A) comprehensive aircraft and general liability insurance against bodily injury or property damage claims including, without limitation, contractual liability, premises damage, public liability, death and property damage liability, public and passenger legal liability coverage, and sudden accident pollution coverage, in an amount not less than $100,000,000.00 for each single occurrence,

    (B) personal injury liability in an amount not less than $25,000,000.00,

    (C) such other property damage insurance (exclusive of manufacturer's product liability insurance) with respect to the Aircraft as is of the type and in the amounts usually carried by companies engaged in the same or a similar business as Borrower, similarly situated with Borrower, and owning or operating similar aircraft and engines, and that covers risks of the kind customarily insured against by such companies,

    (D) Repossession Insurance (in a form acceptable to Lender), and

    (E) insurance otherwise complying with the requirements of Section 4. 6 hereof.

Initials:

    Borrower: _____

    Lender: _____

ANNEX C

## AIRCRAFT DESCRIPTION

One (1) Learjet Inc. Model 60  aircraft that consists of the following components:

    (a)    Airframe bearing FAA Registration Mark N729LJ and manufacturer's serial number 298 (which airframe is certificated for at least eight seats (including crew)).

    (b)    two (2) Pratt & Whitney Canada PW305A aircraft engines bearing manufacturer's serial numbers PCE-CA0455 and PCE-CA0454 (each of which is capable of generating 1,750 or more pounds of thrust).

    (c)    one (1) Jemini model T-20G-10C3A auxiliary power unit bearing manufacturer's serial number SP-E050418.

    (d)    Standard avionics and equipment, all other accessories, additions, modifications and attachments to, and all replacements and substitutions for, any of the foregoing, all as more particularly described on <u>Schedule A</u> attached hereto and made a part hereof.

(LOAN AGREEMENT)

SCHEDULE A TO ANNEX C

## AVIONICS & EQUIPMENT

**Base Aircraft**
**Per Description and Customer Support Services Manual - January 2004**

**Avionics Options:**

| | |
|---|---|
| 34-42-0001 | Enhanced Weather Detection Package |
| 23-10-0003 | Dual VHF-422C Comm w/8.33 kHz Spacing and Enhanced Surveillance (Exchange) |
| 23-12-0003 | Honeywell Second KHF-950 Long Range Comm |
| 34-58-0000 | Automatic Direction Finder (ADF-462)(Second) |
| 31-30-1000 | Digital Flight Data Recorder |
| 23-71-0000 | Cockpit Voice Recorder (Exchange) |
| 34-10-0000 | ALT-4000 Radio Altimeter (Exchange) |

**Equipment Options:**

| | |
|---|---|
| 49-11-0000 | Auxiliary Power Unit (APU) |
| 33-50-0000 | Emergency Lighting Package |
| 33-11-0000 | Lighted Control Wheel Chart Holders |
| 33-41-0000 | Pulsating Recognition and Landing Lights |
| 33-42-0000 | Tail Illumination Package |
| 52-00-1000 | Aircraft Locking Package |

**Interior Options:**

| | |
|---|---|
| 25-40-0000 | Learjet 60 Lavatory with extended baggage |
| 23-20-0002 | ICS-200 Iridium Dual Channel Telephone System (wireless handsets)SE |
| 44-23-0000 | Airshow 400 - South Pacific Map |
| 44-25-0002 | Entertainment- 15.1" (38 CM) Forward Video Monitor |
| 44-25-0003 | Entertainment- 10.4 " (26 cm) Aft Video Monitor |
| 44-22-0003 | Entertainment- Dual DVD Player (Exchanged for Single CD Player) |
| 44-20-0003 | CD Player with 10-Disc CD Changer (Exchange for Std Single CD Player) |
| 44-61-0001 | Additional 110 VAC/60 HZ Power Outlet (each) |
| 25-20-4518 | Plated Trim Package |
| 25-20-4520 | Premium Carpet Package |
| 25-20-4515 | Floor Tracking (all seats) |
| 25-40-4510 | Belted Toilet Seat |
| 25-10-4512 | Forward Pocket Door |
| 25-20-4103 | Slimline Table, 10-inch Wide (H60-08002-2) |
| 25-20-6103 | Right-hand Aft Pyramid Cabinet |
| 25-20-6102 | Left-hand Aft Pyramid Cabinet |
| 25-30-6001 | Hot Liquid Container (Dual) |
| 25-20-4522 | Wood Veneer-High Gloss Finish |

**Floorplan Options:**

| | |
|---|---|
| 25-22-1100 | Learjet 60 floorplan 60-2 |

**Custom Additions**

| | |
|---|---|
| 33-50-0001 | Dual Rechargeable Flashlights |
| 35-20-0003 | Second 77 Cubic Foot Oxygen Bottle in Nose |
| 25-60-0003 | Life Raft Installation |
| 25-30-4514 | Warming Oven |
| SB60-33-7 | Lights - Modification of Strobe Light Switch |
| SB60-55-1 | Stabilizers - Installation of Bird Deterrent Cover Plates |
| 05-2131 | Tow Bar Attachment Head P/N 01-0542-0010 and Portable Tow Bar P/N 01-1216-0000 |

{LOAN AGREEMENT}

ANNEX D

## BORROWER'S and MORTGAGOR'S INFORMATION

| | |
|---|---|
| Primary Hangar Location: | Old Cargo Complex SAAS International Airport, 47200 Subang, Selangor Darul Ehsan, Malaysia |
| Borrower's Chief Executive Offices and Principal Place of Business: | WIJAYA BARU AVIATION SDN. BHD. (Company No. 362080-U) 5th Floor Wijaya International Medical Centre No. 1, Jalan 215, Section 51, Off Jalan Templer 46050 Petaling Jaya, Malaysia Selangor Darul Ehsan |

Borrower's Pilot's or Management Company's address:

1. DNEST Aviation Services SDN. BHD.
   (Company No. 71252-X)
   Old Cargo Complex SAAS International
   Airport, 47200 Subang, Malaysia
   Selangor Darul Ehsan
   Contact:    Captain Earnest
   Telephone: 011-603-7846-2304 or
                   011-603-7847-1060

2. ACI Pacific, LLC
   P.O. Box 21539
   Barrigada, GU 96921-1539 U.S.
   Contact:  Terry Habeck
   Telephone: 671-477-0179

3. Aviation Concepts, Inc.
   P.O. Box 21539
   Barrigada, GU 96921-1539 U.S.
   Contact:  Terry Habeck
   Telephone: 671-477-0179

| | |
|---|---|
| Borrower's form of Organization, Jurisdiction of Organization, Organizational Identification Number and Date of Incorporation | Private Company Malaysia 362080-U 4 October 1995 |
| Mortgagor's Chief Executive Offices and Principal Place of Business | Wells Fargo Bank Northwest, National Association 299 South Main Street 12th Floor Salt Lake City, Utah 84111 |

ANNEX E

## IRREVOCABLE DE-REGISTRATION
## AND EXPORT REQUEST AUTHORIZATION

April ___, 2006

To:     United States Federal Aviation Administration

Re:     Irrevocable De-Registration and Export Request Authorization

The undersigned is the registered owner of one (1) Learjet Inc. airframe model 60 bearing manufacturer's serial number 298, and two (2) Pratt & Whitney Canada aircraft engines model PW305A bearing manufacturer's serial numbers PCE-CA0455 and PCE-CA0454 (together with all installed, incorporated or attached accessories, parts and equipment, the "aircraft").

This instrument is an irrevocable de-registration and export request authorization issued by the undersigned in favor of Merrill Lynch Business Financial Services Inc., Merrill Lynch Capital Division (the "authorized party") under the authority of Article XIII of the Protocol to the Convention on International Interests in Mobile Equipment on Matters specific to Aircraft Equipment. In accordance with that Article, the undersigned hereby requests:

(i)     recognition that the authorized party or the person it certifies as its designee is the sole person entitled to:

    (a)     procure the de-registration of the aircraft from the United States Aircraft Registry maintained by the United States Federal Aviation Administration for the purposes of Chapter III of the *Convention on International Civil Aviation*, signed at Chicago, on 7 December 1944; and

    (b)     procure the export and physical transfer of the aircraft from the United States of America; and

(ii)    confirmation that the authorized party or the person it certifies as its designee may take the action specified in clause (i) above on written demand without the consent of the undersigned and that, upon such demand, the authorities in the United States of America shall cooperate with the authorized party with a view to the speedy completion of such action.

The rights in favor of the authorized party established by this instrument may not be revoked by the undersigned without the written consent of the authorized party.

Please acknowledge your agreement to this request and its terms by appropriate notation in the space provided below and lodging this instrument in the United States Aircraft Registry.

300518                                                                    (LOAN AGREEMENT)

Wells Fargo Bank Northwest, National
Association, a national banking association organized
and existing under the laws of the United States of
America, not in its individual capacity but solely as
"Owner Trustee" (under a Trust Agreement  dated
as of April ___, 2006, with Wijaya Baru
Aviation S.D.N. BHD., as the beneficiary and settlor
of such trust)

United States Federal Aviation Administration

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

Agreed to and lodged this
_____ day of _____, 200___


_____
[insert relevant notational details]

300518

(LOAN AGREEMENT)

## CLOSING TERMS ADDENDUM

CLOSING TERMS ADDENDUM ("Closing Terms Addendum") to Loan and Aircraft Security Agreement (S/N298) dated as of April 12, 2006 (the "Agreement"), by and among MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., MERRILL LYNCH CAPITAL DIVISION, as lender ("Lender"), WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely as "Owner Trustee" (under a "Trust Agreement", known and denominated as the Wijaya Baru Aircraft Trust and dated as of April 12, 2006, by and between Borrower and Wells Fargo Bank Northwest, National Association) ("Mortgagor") and WIJAYA BARU AVIATION SDN. BHD. (Company No. 362080-U), as Borrower ("Borrower").

All capitalized terms not defined in this Closing Terms Addendum are defined in the Agreement. Execution of the Agreement by Borrower, Mortgagor and Lender shall be deemed to constitute execution and acceptance of the terms and conditions of this Closing Terms Addendum, and it shall supplement and be a part of the Agreement.

Conditions Precedent:

1.    On or prior to the Closing Date and at least one full Business Day prior to closing, Lender shall have received all of the following, in form and substance satisfactory to Lender (and duly executed by all the parties):

(a)    evidence that Borrower and Mortgagor each has become a transacting user entity with the International Registry and appointed an administrator and a professional user entity to act on each of Borrower's and Mortgagor's behalf;

(b)    the Agreement, the Note, the Guaranty, the Letter of Credit, and the other Loan Documents duly executed by Borrower, Mortgagor, Guarantors and any lessee(s) and/or management company(s));

(c)    the Agreement of Guaranty dated as of the Closing Date, by Dato' Seri Tiong King Sing (Date of Birth September 3, 1961, with Malaysia Passport number K10647373) ("Individual Guarantor"), WIJAYA BARU HOLDINGS SDN. BHD. and KUALA DIMENSI SDN. BHD. ("Guarantors") in favor of Lender (the "Guaranty") duly executed by Guarantors;

(d)    if required by Lender, an opinion or opinion of counsel for Borrower, Mortgagor and Guarantors addressed to Lender as to such matters incident to the Loan as Lender may reasonably require;

(e)    Certificate(s) of good standing for Borrower and corporate Guarantors from its/their jurisdictions(s) of organization and the jurisdictions where the primary hangar location of the Aircraft and Borrower's chief executive offices and principal place of business are located (or the equivalent thereof);

(f)    a certificate for Borrower and corporate Guarantors executed by Borrower's and corporate Guarantor's secretary or other authorized representative certifying: (i) that the execution, delivery and performance of the Agreement and the other Loan Documents and the entry by Borrower and corporate Guarantors into the transactions contemplated hereby and thereby have been duly authorized, (ii) the name(s) of the Person(s) authorized to execute and deliver such documents on behalf of Borrower and corporate Guarantors together with specimen signature(s) of such Person(s); (iii) Borrower's and corporate Guarantors charter, certificate of incorporation, by-laws, memorandum and articles of association, operating agreement, and other governance documents, as applicable and any amendments thereto (or the equivalent thereof); and (iv) the name(s) of the Person(s) appointed by Borrower and Mortgagor as administrator and professional user entity for purposes of initiating or consenting to registrations with the International Registry;

(g)    evidence as to the insurance coverage required under the Agreement, including, but not limited to, a certificate of insurance (with repossession insurance in a form acceptable to Lender), copies of

(LOAN AGREEMENT)

endorsements (including a Lender endorsement), and, if requested by Lender, copies of applicable policies and written confirmation from the insurance underwriter or broker that the insurance coverage provided is in compliance with the requirements of Section 4.6 of the Agreement, and if requested by Lender, delivery of a notice and acknowledgement of assignment of insurances with respect to the assignment of insurances contained in the Loan Documents;

(h)   if required by Lender, an inspection report and/or appraisal satisfactory to Lender with respect to the Aircraft prepared by inspector(s) or appraiser(s) acceptable to Lender;

(i)   copies of: (i) the Purchase Agreement entered into by Borrower in connection with the acquisition of the Aircraft and all schedules, exhibits attachments and amendment thereto, (ii) the warranty bill of sale conveying title to the Aircraft from Vendor to Borrower; (iii) if required by Lender, invoices for the purchase of the Aircraft, (iv) evidence that the sale pursuant to which Borrower obtained title to the Aircraft and Engines has been registered on the International Registry; and (v) such other documents relating to the purchase or conveyance of title as Lender may request;

(j)   copies of the executed FAA Aircraft Registration Application (AC Form 8050-1), FAA Entry Point Filing Form-International Registry(s) (AC Form 8050-135), and FAA Standard Airworthiness Certificate (AC Form 8100-2) for the Aircraft;

(k)   an executed original of the Trust Agreement (and evidence that FAA Aeronautical Center Counsel has approved the same), the Operating Agreement and any affidavit of citizenship of Owner Trustee or other documents of Owner Trustee required to register the Aircraft and a request for Declaration of International Operations (i.e., a fly-wire request);

(l)   a copy of Borrower's Engine Maintenance Program for the Engines and a collateral assignment of Borrower's rights thereunder and of the engine reserves thereunder;

(m)   a copy of Borrower's Computerized Maintenance Monitoring Program for the Airframe; and a collateral assignment of Borrower's right's thereunder (if required by Lender);

(n)   a copy of each of the Management Agreements and the corresponding Consent(s) to Management Agreement(s) in the form required by Lender and a copy of any lease to be entered into with respect to the Aircraft and a consent to lease and assignment in the form required by Lender with respect to such lease;

(o)   a copy of any automatic payment authorization and pay proceeds letter required by Lender;

(p)   evidence that any financing statements or other security/lien notice/perfection documents have been filed as required by applicable law (including, without limitation any notation of the lien and security interest in the Aircraft and other assets or documents granted by Borrower in favor of Lender in Borrower's registry of charges (or equivalent registry));

(q)   evidence that there are no prior liens on the Aircraft and an opinion of Lender's FAA Counsel with respect to the perfection of Lender's Lien in the Aircraft (and to such other matters as Lender may require);

(r)   evidence that CT Corporation System has accepted its appointment as agent to receive service of process on behalf of Borrower and Guarantors;

(s)   the Commitment Fee from Borrower;

(t)   evidence satisfactory to Lender that Borrower has obtained any permits, approvals, consents, authorizations, concessions or other permissions required under Applicable Law for the proper operation, hangaring and maintenance of the Aircraft, including, without limitation, any permits, approvals, consents, authorizations, concessions or other permissions required under Malaysian law or by any

governmental agency or department of Malaysia (including the DCA) and that the same are in full force and effect;

(u)   such other documents, certificates and opinions, and evidence of such other matters (including evidence of the registration of the Loan with the Central Bank of Malaysia and the relevant searches conducted on the Borrower and the Guarantors, as Lender, Lender's counsel or FAA Counsel, may reasonably request; and

(v)   a satisfactory search of the lien/security interest filings (or their equivalent), litigation filings and tax lien filings for Borrower and Guarantors (and such other Persons as deemed necessary by Lender) (including, evidence satisfactory to Lender that the tax judgment of Usama Industries SDN. BHD. has been satisfied in full).

2.   On the Closing Date, Lender shall have received evidence that the Aircraft shall have been duly delivered to and accepted by Borrower in a Contracting State to the Cape Town Convention and that the entire purchase price of the Aircraft has been fully paid.

3.   On or prior to the Closing Date, Lender shall have received evidence that FAA Counsel has received in escrow: (i) a warranty bill of sale in the name of Mortgagor; (ii) the executed FAA Aircraft Registration Application (AC Form 8050-1) in the name of Mortgagor (except for the pink copy, which shall be available to be placed on the Aircraft upon acceptance thereof); (iii) the FAA Entry Point Filing Form-International Registry (AC Form 8050-135); (iv) the IDERA; (v) executed releases in form and substance satisfactory to FAA Counsel of any Liens on the Aircraft, including, without limitation, discharge of any prior international interests filed with the International Registry; (vii) the Trust Agreement (and an affidavit of citizenship with respect to Mortgagor); (vii) such other documents as are necessary, in the opinion of Lender's counsel and/or FAA Counsel to vest good title to the Aircraft in the name of Mortgagor and to perfect Lender's first priority security interest in the Aircraft and Lender's first priority registered international interest in the Aircraft, including, without limitation, any necessary or desirable subordination agreements; and (vii) the executed original of the Agreement, all the foregoing being in proper form for filing with the FAA.

4.   On the Closing Date, Lender shall have received assurances from FAA Counsel satisfactory to Lender, in form and substance satisfactory to Lender, that (i) the Aircraft (including the Airframe and Engines) is free and clear of all other Liens of record with the FAA and the International Registry, (ii) title to the Airframe is vested in Mortgagor or that, upon filing of the warranty bill of sale in the name of Mortgagor, title to the Airframe will be vested in Mortgagor, (iii) Lender, upon filing of the Agreement with the FAA and registration of an international interest with the International Registry, will have a valid and perfected security interest in the Aircraft (including the Airframe and the Engines), (iv) the filing of the Agreement with the FAA has been effected; and (v) the registration of the international interest is searchable on the International Registry.

(LOAN AGREEMENT)

EXHIBIT B

**LEASE**

# AIRCRAFT LEASE AGREEMENT

This AIRCRAFT LEASE AGREEMENT, dated as of April 12, 2006 (this "Lease"), is between WIJAYA BARU AVIATION SDN. BHD., a private company limited by shares under the laws of Malaysia ("Lessor"), and WIJAYA INTERNATIONAL MEDICAL CENTRE SDN. BHD., a private company limited by shares under the laws of Malaysia ("Lessee"). The following sections set forth the agreement of Lessor and Lessee.

SECTION 1. <u>Lease of Leased Property; Term; Rent</u>.

1.1    <u>Lease of Leased Property</u>.  On and as of the date hereof Lessor leases to Lessee, and Lessee leases from Lessor, the equipment listed on Schedule "A" attached hereto (the "Leased Property") in accordance with the terms hereof.

1.2    <u>Term.</u>  The Leased Property shall be leased by the Lessor to the Lessee for the period set forth on Schedule "B" attached hereto (the "Term").

1.3    <u>Basic Rent</u>.  During the Term, the Lessee shall pay to Lessor basic rent in the amount set forth on Schedule "B" attached hereto ("Basic Rent").

SECTION 2. <u>Registration; Maintenance; Insurance; Operation; Possession</u>.

2.1    <u>Registration</u>.  At all times during the Term, the Aircraft shall remain registered in the name of Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as owner trustee (the "Owner Trustee") , with the Federal Aviation Administration of the United States ("FAA").

2.2    <u>Maintenance</u>.  Lessee shall service, repair, maintain, overhaul, test or cause the same to be done to the Aircraft (as defined in Schedule "A") (a) so as to keep in full force and effect the Certificate of Airworthiness for the Aircraft issued by the FAA and (b) in accordance with the terms of that certain Loan and Aircraft Security Agreement (S/N 298) dated as of April 12 , 2006 (the "Security Agreement") among the Lessor, the Owner Trustee and Merrill Lynch Business Financial Services Inc., Merrill Lynch Capital Division ("MLBFS").

2.3    <u>Operation of the Equipment</u>.  Lessee shall operate the Aircraft (a) with fully licensed and approved crews; (b) in compliance with the rules and regulations of the FAA applicable to the Aircraft and its operation and (c) in accordance with the terms of the Security Agreement. Lessee shall not operate the Aircraft in (i) any zone which is declared a war zone by any insurer or reinsurer of the Aircraft against hull or war risks, if

any, (ii) any zone in respect of which any insurer or reinsurer of the Aircraft shall have withdrawn any coverage for the Aircraft, (iii) any zone as to which a travel advisory has been issued and is then in effect by any United States governmental agency cautioning as to or otherwise depicting as dangerous or unsafe travel into such zone. Lessee shall not use or operate the Aircraft in any manner or for any purpose excepted from any of the insurance on the Aircraft.

2.4    Data.  Throughout the Term, Lessee shall maintain accurate and complete logs and records for the Aircraft (the "Data") in English, with respect to all maintenance carried out on the Aircraft and all operations of the Aircraft. The Data shall be maintained in compliance with the requirements of the FAA.

2.5    Insurance.  Lessee shall maintain insurance for the Aircraft with insurers approved by the Lessor and in the amounts and of the types approved by the Lessor.

2.6    Transfers of Possession.  Lessee shall not sublease or otherwise in any manner deliver, transfer or relinquish possession or control of, or transfer any right, title or interest in, any part of the Leased Property; provided, however, that Lessee may deliver temporary possession of the Aircraft or any part thereof to its manufacturer for testing or other similar purposes, or to any organization for testing, service, repair, maintenance or overhaul.

2.7    Event of Loss.  If any damage occurs to the Aircraft during the Term, all insurance proceeds with respect thereto shall be payable to Merrill Lynch Business Financial Services Inc., Merrill Lynch Capital Division ("MLBFS"); provided, however, that for all periods of time after MLBFS releases the security interest in its favor created by that certain Loan and Aircraft Security Agreement (S/N 298) dated as of April    , 2006 (the "Security Agreement") among the Lessor, the Owner Trustee and MLBFS, such insurance proceeds shall be payable to Lessor or, at Lessor's direction, to any other person or entity.

SECTION 3. Events of Default; Remedies.

3.1    Events of Default.  Each of the following events shall constitute an Event of Default (whether any such event shall be voluntary or involuntary):

(a)  Lessee shall fail to pay in full any Basic Rent within three days of its due date;

(b)  Lessee shall fail to maintain insurance for the Aircraft as required by Section 2.5;

( c )  Lessee shall fail to perform or observe any other covenant, warranty, condition or agreement to be performed or observed by it hereunder and such failure shall continue unremedied for a period of 10 days after notice from Lessor; or

(d)  Lessee, through a voluntary or involuntary proceeding, shall seek to liquidate or reorganize under bankruptcy, moratorium or similar law.

3.2   Remedies.  Upon the occurrence of any Event of Default specified in Section 3.1(d), this Lease shall be automatically deemed in default.  Upon the occurrence of any other Event of Default and while such Event of Default is continuing, Lessor may at its option declare this Lease to be in default.  Any time after this Lease has become or been declared by Lessor to be in default, Lessor may exercise any remedies permitted under the laws of Malaysia or any remedies specified under the Capetown Convention (as defined in the Security Agreement).

SECTION 4.  Lessee's Indemnities.  Lessee assumes liability for, indemnifies each of Lessor and its officers, directors,  members and affiliates (collectively, the "Indemnitees") against and shall protect, save and keep harmless each Indemnitee from any and all liabilities, obligations, losses, damages, penalties, claims (including claims for liability in tort, strict or otherwise), actions, suits, taxes, costs, expenses, and disbursements, including legal fees and expenses, of whatever kind and nature, imposed on, incurred by or asserted against any Indemnitee in any way relating to or arising out of (i) this Lease or (ii) the delivery, non-delivery, warehousing, storage, transportation, removal, lease, possession, use, operation, sublease, condition, maintenance, sale, return, transfer of title or other disposition of any part of the Leased Property or any accident in connection with any of the Leased Property (including latent or other defects, whether or not discoverable).

SECTION 5.  Miscellaneous.

5.1   Assignment; Written Amendment .  Neither Lessee nor Lessor may assign its rights hereunder without the prior written consent of the other party.  Lessor and Lessee may only amend this Lease by a written instrument signed by both parties.

5.2   Governing Law .  This Lease shall in all respects be governed by and construed in accordance with the laws of Malaysia applicable to contracts made by residents thereof to be wholly performed therein.

5.3   Waiver of Jury Trial .  Each of Lessor and Lessee hereby waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or

otherwise, arising out of, connected with, related to or in connection with this Lease. Instead, any dispute resolved in court will be resolved in a bench trial without a jury.

5.4  Notices.  All notices, requests, demands or other communications required under or given pursuant to this Lease shall be in writing and shall become effective (a) when delivered personally or by mail, or (b) when transmitted by telefax or telex to the address for the Lessee or the Lessor set forth on Schedule "B" attached hereto.

5.5  Counterparts.  This Lease may be executed by Lessor and Lessee in separate counterparts, each of which when so executed and delivered shall be an original, but all counterparts shall together constitute but one and the same agreement.

5.6  Consent To Assignment; Subordination.

(A) LESSOR ACKNOWLEDGES AND CONSENTS TO THE COLLATERAL ASSIGNMENT BY LESSEE TO MLBFS OF LESSEE'S RIGHTS UNDER THIS LEASE.

(B)  LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE'S INTEREST, WITH RESPECT TO LIENS AND ENCUMBRANCES OVER OR POSSESSION OF THE AIRCRAFT (AND ANY RELATED LEASED PROPERTY), PURSUANT TO THIS LEASE IS SUBJECT AND SUBORDINATE TO THE INTEREST OF MLBFS, PURSUANT TO THE SECURITY AGREEMENT AND TO ALL THE TERMS, CONDITIONS AND PROVISIONS THEREOF AND TO ANY RENEWALS, EXTENSIONS, MODIFICATIONS OR REPLACEMENTS THEREOF. UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT BY LESSOR UNDER THE SECURITY AGREEMENT, MLBFS SHALL HAVE THE RIGHT TO REPOSSESS THE AIRCRAFT (AND ANY RELATED PROPERTY) FREE AND CLEAR OF ANY LIENS OR ENCUMBRANCES OF LESSEE AND LESSEE SHALL HAVE NO FURTHER RIGHTS OR RECOURSE AGAINST MLBFS OR THE AIRCRAFT (OR ANY RELATED PROPERTY) WITH RESPECT TO THE SAME AND LESSOR AND LESSEE HEREBY AGREE TO EXECUTE ANY TERMINATION OF THIS AIRCRAFT LEASE AGREEMENT REASONABLY REQUIRED BY MLBFS WITH RESPECT TO THE FOREGOING. IT IS HEREBY AGREED THAT THIS PROVISION SHALL INURE TO THE BENEFIT OF MLBFS AND ITS SUCCESSORS AND ASSIGNS.

5.7  TRUTH-IN-LEASING.

AT THE COMMENCEMENT OF THIS LEASE, THE AIRCRAFT IS A NEW AIRCRAFT

THAT HAS BEEN DELIVERED TO THE LESSOR BY THE MANUFACTURER. UPON EXECUTION OF THIS LEASE AND DURING THE TERM HEREOF, THE LESSEE CERTIFIES THAT THE LESSEE SHALL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THE LEASE AND THAT THE AIRCRAFT WILL BE MAINTAINED BY THE LESSEE UNDER FAR PART 91.

THE LESSEE, WIJAYA INTERNATIONAL MEDICAL CENTRE SDN. BHD., WITH AN ADDRESS SET FORTH IN SECTION 3 OF SCHEDULE "B," CERTIFIES THAT IT UNDERSTANDS ITS RESPONSIBILITIES FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION ADMINISTRATION REGULATIONS. THE LESSEE SHALL MAIL AN EXECUTED COPY OF THIS LEASE TO THE FEDERAL AVIATION ADMINISTRATION, AIRCRAFT REGISTRATION BRANCH, ATTENTION: TECHNICAL SECTION, P.O. BOX 25724, OKLAHOMA CITY, OKLAHOMA 73125 AND SHALL CARRY A COPY OF THIS LEASE IN THE AIRCRAFT AT ALL TIMES.

AN EXPLANATION OF THE FACTORS BEARING ON THE OPERATIONAL CONTROL AND PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FEDERAL AVIATION FLIGHT STANDARD DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE OR AIR CARRIER DISTRICT OFFICE.

**[signature page follows]**

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Aircraft Lease Agreement to be duly executed and delivered as of the day and year first above written.

LESSOR:

WIJAYA BARU AVIATION SDN. BHD.
The Common Seal of                                                    )
WIJAYA BARU AVIATION SDN. BHD.                      )
(Company No. 362080-U)                                            )
Was hereunto affixed in accordance with                   )
Its Articles of Association                                          )
In the presence of                                                    )

_____
Director

_____
Director

LESSEE:

WIJAYA INTERNATIONAL MEDICAL
CENTRE SDN. BHD.
The Common Seal of                                                    )
WIJAYA INTERNATIONAL MEDICAL                         )
CENTRE SDN. BHD.                                                  )
(Company No. 621976-D)                                            )
Was hereunto affixed in accordance with                   )
Its Articles of Association                                          )
In the presence of                                                    )

_____
Director

_____
Director

## SCHEDULE A

### DESCRIPTION OF LEASED PROPERTY

1. Airframe

| | |
|---|---|
| Manufacturer: | Learjet Inc. |
| Model: | 60 |
| Manufacturer's Serial Number: | 298 |
| U.S. Registration Number: | N729LJ |

2. Engines

| | |
|---|---|
| Manufacturer: | Pratt & Whitney Canada |
| Model: | PW305A |
| Serial Numbers: | PCE-CA0455 and PCE-CA0454 |
| | each of which exceeds the equivalent of 750 rated takeoff horsepower |

3. Spare Parts

Any and all parts or avionics installed on or appurtenant to the Airframe and the Engines

(the Airframe, the Engines and the Spare Parts being hereinafter collectively referred to as the "Aircraft")

4. Aircraft Documents

All logs, records and manuals for the Airframe, the Engines or the Spare Parts

## SCHEDULE B

## ECONOMIC AND OTHER TERMS

1.  <u>Term</u>.   The term of this Lease shall commence on the date hereof and terminate on the earlier of: (a) the date the Aircraft is placed on the Part 135 Operating Certificate of Aviation Concepts Inc. or (b) the date that is the one year anniversary of the date of this Lease (the "Term").

2.  <u>Basic Rent</u>.   Lessee shall pay Lessor basic rent in the amount of $1000.00 per month or such other amount mutually agreed upon by Lessor and Lessee, which amount shall be payable on the 1st day of each month.

3.  <u>Addresses for Notices</u>

For the Lessor:

5th Floor, Wijaya International Medical Centre
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan,
Malaysia
Attn: Stephen Abok
Telephone:  011-603-77813779
Facsimile:  011-603-77853117

For the Lessee:

5th Floor, Wijaya International Medical Centre
No. 1, Jalan 215, Section 51, Off Jalan Templer
46050 Petaling Jaya
Selangor Darul Ehsan,
Malaysia
Attn: Stephen Abok
Telephone:  011-603-77813779
Facsimile:  011-603-77853117